Filed 11/2/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>TODD ALAN WINKLER,<br><br>        Defendant and Appellant. | C077992<br><br>(Super. Ct. No. P13CRF0308) |

       APPEAL from a judgment of the Superior Court of El Dorado County, Kenneth J. Melikian, Judge.  Affirmed.

       Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

       Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Robert C. Nash, Deputy Attorney General, for Plaintiff and Respondent.

---

*  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II – V of the Discussion.

Defendant killed his third wife (the victim) by plunging a pair of scissors into her neck, severing her jugular vein. She had been having an extramarital affair and was planning to divorce defendant. Defendant did not deny killing her, but claimed he did so in self-defense. A jury found defendant guilty of murder in the first degree and found true the enhancement allegation that defendant personally used a deadly or dangerous weapon in the commission of the murder. (Pen. Code, §§ 187, 189, 12022, subd. (b)(1).)[1] The trial court sentenced defendant to a term of 26 years to life.

On appeal, defendant asserts that: (1) the trial court erred in admitting, pursuant to Evidence Code section 1101, subdivision (b), evidence related to the 1999 death of his second wife as relevant to his intent to kill the victim, the absence of mistake or accident, or to negate self-defense; (2) the trial court erred in admitting the victim's prior statements to others about her fear of defendant; (3) the cumulative effect of the foregoing errors requires reversal; (4) the evidence was legally insufficient to support a finding of premeditation and deliberation so as to support a conviction of first degree murder; and (5) an error on the abstract of judgment must be corrected.

We conclude the trial court abused its discretion in admitting evidence of the 1999 death of defendant's second wife under Evidence Code section 1101, subdivision (b). The Georgia authorities where the incident took place determined the death was accidental. Before allowing the jury to hear this evidence, the trial court had a gatekeeping duty under Evidence Code section 403, subdivision (a) to determine whether there was sufficient evidence to establish a homicidal act by a preponderance of the evidence. In doing so, the trial court relied on evidence related to the charged offense as proof of the earlier homicidal act. This was error. We further conclude that any probative value the uncharged act evidence had was substantially outweighed by the

---

[1] Further undesignated statutory references are to the Penal Code unless otherwise indicated.

Evidence Code section 352 concerns of undue consumption of time and undue prejudice. However, given the strength of the admissible evidence, we conclude the error was harmless.

As to his asserted error regarding evidence related to the victim's fear of him, defendant forfeited several of these contentions. Those contentions which are preserved are either without merit or harmless. As to those claims which defendant forfeited, we conclude that, contrary to defendant's contentions, he was not denied the constitutionally effective assistance of counsel for his attorney's failure to object to the evidence. We also reject defendant's cumulative error argument. And we conclude there was substantial evidence of premeditation and deliberation to support his conviction of murder in the first degree. Finally, we agree with defendant that the abstract of judgment must be corrected to reflect that the indeterminate sentence imposed was 25 years to life, and delete reference to the term of life without the possibility of parole.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of defendant's claims, a fairly detailed summary of the evidence presented at trial and the hearing concerning the uncharged act evidence is required.

### The Prosecution's Evidence

### Defendant's Report of a "Domestic Incident," His Physical Condition & Arrest

At approximately 10:30 or 11:00 a.m. on February 27, 2012, D.B., defendant's neighbor and a social acquaintance, received a telephone call from defendant. Defendant told D.B. there had been a domestic incident, and that the victim had been killed. D.B. told defendant that he would call 911 while defendant took his children to a neighbor's house.

At approximately 10:30, defendant knocked on the door of his neighbors, V.J. and B.J. B.J. answered the door and defendant stated there was a medical emergency and he

3

asked them to watch his children. When defendant dropped off the children, V.J. noticed that defendant had "taken a shower. He smelled like shampoo or cologne." V.J. testified that defendant did not have any injuries on his hands or face. When defendant handed V.J. his infant son, she saw that there were no injuries on his hands. B.J. also testified that he did not observe any injuries to defendant's hands or face. V.J. and B.J. both testified that defendant's tone was "normal," he had no tears in his eyes and was not acting nervous, emotional, or with any urgency or panic.

At approximately 10:40, El Dorado County Deputy Sheriff Michael Roberts responded to the defendant's house. Roberts parked across the street and kept the house under observation while awaiting additional units. Seventeen minutes after he arrived, defendant emerged from the house. Roberts pointed his firearm at defendant, identified himself, and ordered defendant to approach him with his hands in the air. Roberts observed bandages on both of defendant's hands. The bandages were "obvious" and he first noticed them from some 20 feet away. Roberts later observed a "pretty significant gouge . . ." to one of defendant's thumbs. After placing defendant in his patrol car, Roberts and other law enforcement officers entered the house. When Roberts saw the victim, it was clear that she was dead.

### Defendant's Interview Statement Describing the Killing[2]

Detectives Michael Lensing and Paul Hadjes interviewed defendant on the day of his arrest. Defendant stated that the victim had been having an affair, he had recently accepted the fact that she did not wish to reconcile with him, and she had told him that she wanted primary custody of the children. Defendant stated that, on a family trip to Las Vegas the previous weekend, he finally accepted that the couple would divorce. The victim "started to lay out . . . all the terms that she had wanted and . . . one of them was

---

[2] The two-hour interview between defendant and two detectives was video recorded. A substantial portion of the recording was played for the jury.

primary custody of the children and [she] wants to keep the children up here in—in this area, in the Cameron Park area because that's where her boyfriend lives."

Defendant told the detectives he woke up at approximately 3:30 a.m. that morning to prepare to leave for work in Alameda County. He went into the victim's bedroom, as they had been sleeping in separate bedrooms, and crawled into bed next to her, which, according to defendant, was "still . . . okay with her, no sexual relations . . . ." She was awake. Defendant told her that he would not agree to allow her to have full custody of the children. He told her, "I'm a—going to fight you on this." According to defendant, the victim responded, "I can have my boyfriend get rid of you." Defendant told the detectives the victim's boyfriend was "a big gun collector . . . I don't know if he's dangerous or not but his ex-wife says that he is . . . ." Defendant said after the victim's comment, he hit her with his fist on the right side of her face. She sat up with her back to him. Defendant rubbed her back and apologized. According to defendant, the victim then turned around and came at him "with a V of scissors." Defendant said he "got a hold of them," got his hand "into the V" and then they struggled over the scissors and fell off the bed. He said he took some cuts to his hands trying to get the scissors away from her, including the cut the detective noticed when he and the detective shook hands earlier.

Defendant stated he "was able to get—em turned around onto her . . . ," "[a]nd give her some—some jabs, a lot of jabs . . . ." He "was just striking for her face." The couple engaged in a "long, long protracted struggle" over the scissors. According to defendant, the victim was "a very strong girl" and was in much better shape than he was. During the course of the struggle, she was injured, but "probably not seriously." Defendant stated that he "poked her in the eye really hard[3] and got her to break free . . . ." He then dropped the scissors and ran to the garage.

---

[3] During his testimony at trial, he explained he poked the victim in the eye with his thumb.

5

In the garage, defendant became concerned about the children and felt that he needed to get his infant child out of the victim's bedroom. Defendant put on a padded motorcycle jacket because it had pads "for like breaking down the door" and returned to the bedroom. As Lensing went over the events a second time, defendant said that, at this point, he was concerned that the victim may have been drinking, and he should not leave the children in the house.

When defendant returned to the victim's bedroom, the door was closed. He turned the doorknob, rushed into the room, tripped on something in the doorway, and fell down at the foot of the bed on all fours. The victim, who was sitting on the floor, kicked him in the face. Defendant became enraged, and he "went after her." They began to struggle on the floor. Defendant "bear crawled up her," and tried to choke her with both hands. According to defendant, the victim "end[ed] up with the scissors again in her hand." Defendant said he "started to get the upper hand . . . ," and eventually got control of the scissors and "went for her throat." He struck her on the face and throat.

Defendant told the detectives that the victim begged for her life, and repeatedly told him they could "resolve this." She said they would not get a divorce, and she begged for her life and for defendant to "give [her] another chance." She pleaded with him: "[d]on't do this." However, defendant told the detectives he "felt like if [he] g[a]ve her a chance she'll be right back at [him] and [he] was exhausted." According to defendant, he "pushed the scissors in as far as [he] could." Defendant explained he "[j]ust tried to drive it deeper and deeper" into her throat. He said he was in a rage, but he also felt like he was in a "kill or be killed" situation. Defendant acknowledged that, at that point, he wanted the victim to die. He stated, "I just . . . went for the throat and then eventually her body went limp." He said it took "a long time" before she went motionless.

Defendant said he "just laid there on top of her for a long time to make sure she actually was (inaudible) but I (inaudible) for I don't know how long, for a long time." He estimated that he laid on top of her for five or ten minutes. He told the detectives that

6

approximately 30 minutes later, he tried to resuscitate her. He performed chest compressions, but "blood just flowed out of her," "blood just squirted out, I mean big time, there was blood everywhere—um—she's clearly dead."

Not wanting his children to "see their mom all bloody and see there's blood everywhere," defendant began to clean up the blood. After it became light and all three children were up, defendant got the children situated in another part of the house. He then went back to the victim's bedroom and thought, "what do I do with all these cleaning supplies, this looks horrible." Defendant threw the cleaning supplies into the fire in the fireplace. He stated he bandaged himself when he cleaned himself up.[4]

Thereafter, he called D.B. and told him: "[The victim's] dead. We got in a—we got in a fight. She came at me with a pair of scissors but—um—I didn't have to take it that far." Defendant asked D.B. to call 911 while he brought the children to a neighbor's house.

Defendant told the detectives he should not have confronted the victim because she had "been spinning a little more and more out-of-control, whole lots of different . . . things indicated that . . . you know, a powder keg." He said she had been binge drinking.

He acknowledged that the victim had made up her mind about the divorce. However, when he mentioned getting an attorney, she said they should "leave the attorneys out of this" and go to mediation.

He said when he went back into her room, his priority was getting the baby. He stated, "I want my children" and "I'm thinking get possession now . . . or I may never get possession." He was thinking he would just grab his son and the two girls and leave.

---

[4] At trial, defendant testified that he cleaned and bandaged his hands before going to the J.s.

7

**The Investigation and Autopsy**

Lensing had Deputies Palmberg and Massingale transport defendant to a medical center to have his blood drawn and to have his hands examined. Photographs showed injuries to defendant's left cheek and nose, the backs of his hands, his left thumb, his palms, his left hand and index finger, and to his left thigh. Palmberg described defendant during this time as "[v]ery quiet. Kind of a stern look on his face. Really a lack of any type of real emotion." Defendant was 5 feet 6 inches tall and weighed 230 pounds at the time of his arrest.

Lensing returned to defendant's house for a more detailed review of the scene. Based on blood stains, their location, blood flow on the victim's body, spatter patterns, and the coagulation of the blood, Lensing concluded that the victim was seated in an upright position when she received the wound to her neck.

Lensing looked throughout the house for a Toshiba computer that belonged to the victim. However, law enforcement never located it. Also, there was a hard drive missing from a computer at the house which was never located. A box labeled "Ashes of [name of defendant's second wife]" was found in a bed stand in the master bedroom.

Dr. Stephany Fiore, a forensic pathologist, performed the autopsy. The victim was 5 feet 3 inches tall, and weighed 110 pounds. She sustained abrasions to her nose, face, and lips. She had bruising around her eye and an abrasion beginning above her eyebrow and extending onto her cheek. The bruising under the victim's eye could have been caused by punching or similar direct trauma. A cluster of wounds on the victim's left arm and hand were consistent with bite marks. The victim had some pinpoint hemorrhaging in her eye that could have resulted from neck compressions or strangulation. And she had a fractured rib on her left side, which could have been inflicted by a bear-type hug.

The victim had multiple incised wounds which could have been caused by the blades of scissors. One such wound was partially gaping and extended from the edge of

8

her eyelashes down her cheek, exposing her cheekbone. Another, more shallow, incised wound extended from her eyelashes towards her ear.

There was a small abrasion to the cheek and multiple similar injuries behind the ear, on her neck and in the area of the collar bone. Dr. Fiore opined that these wounds could have been caused by the tip of closed scissors.

The victim also had several linear wounds crossing the front of her neck from one side to the other. These were consistent with something long being drawn across the skin of her neck. She described these wounds as being "like tracks," "a pattern that's being repeated on the neck." Additionally, there was a stab wound to the victim's lip that punctured through to the inside. The victim also had a "fairly deep" stab wound just above the buttocks.

The victim had multiple incised and stabbing wounds to her hands, which Dr. Fiore described as defensive. There was a stab wound on the victim's left hand between her thumb and index finger. As for her right hand, there were cuts across the joints of her index, middle, and ring fingers which, on two of those fingers, cut into, and in one case, through her tendons, causing the index and middle fingers to "go straight." It was "like something was drawn across all those fingers at one time." There were also separate "small pokes" to the palm of the right hand.

Fiore also noted the victim had multiple abrasions and bruises to her knees. These wounds had the appearance "like she maybe had been on her knees, fell to her knees, moving around on her knees."

Fiore testified that the victim sustained a fatal stab wound to the right side of her neck. This wound was created by an object with two closed or overlapping blades, such as scissors, "being driven into the neck." The wound was approximately an inch and a half deep, extending into her jugular vein.

Fiore testified that death would not have been instantaneous. Rather, it would have taken several minutes, perhaps as many as ten, before the victim lost enough blood

9

to lose consciousness, and several more minutes, but less than a half an hour, before she died.  At the time of her death, the victim's blood alcohol level was 0.011 percent.

Based on photographs of defendant's hands, Fiore testified that, in addition to a number of superficial wounds, some of which she described as scratches, defendant sustained a deep wound to his left thumb with the tissue appearing to have been cut away.  Fiore testified it looked "more kind of cut out" than a defensive wound.  Defendant also had a stab wound to the palm of his right hand that could have been caused by scissors twisting into it.  Additionally, he sustained a fairly deep linear wound to his left thigh.

### The Affair and the Victim's Plans for Divorce

D.E. was a pilot, and he had met the victim when she managed the Cameron Park Airport.  J.W. lived with D.E.  J.W. met the victim in September 2009; they worked together and then became friends.  In June 2010, they began a romantic relationship.  In 2013, they planned to marry.  J.W. testified the victim felt guilty about having an affair, particularly because her father was a pastor.  She also knew it was not fair to defendant that she was having an affair, but she wanted to divorce him.

At some point, the victim told J.W. that defendant was aware of the affair.  In an October 2010 e-mail to J.W., the victim expressed concern that defendant was suspicious, and she told J.W. they had to "put it on ice for a while."

In another communication, the victim complained of how much money defendant spent, and wrote:  "This is what scares me about [defendant].  He spends to the max, and so divorce is going to piss him off."  The victim noted that defendant made $200,000 or $280,000 annually and said, "[w]e are rich," but followed that with:  "Hahhahahaha.  And I worry about getting offed over child support."  The victim further wrote:  "[defendant] will definitely move on.  He doesn't care about me and what I do, just what affects him, his money."  On one occasion, J.W. asked the victim if defendant was abusive, and she responded, "I don't bruise easily."  The victim also told J.W., D.E., and her brother on

10

separate occasions that defendant had raped her, and that was how she became pregnant with her third child.

Je.W. met the victim when they were in college. In October 2011, Je.W., the victim, and two other friends went to Calistoga for a "girls' weekend." During a conversation that weekend, the victim started to cry. She said that her marriage was falling apart, and said that she needed advice and help. The victim stated that defendant was extremely controlling. He did not let her have money and she had been forced to ask friends for money for diapers and formula. Her house was in a state of disrepair and defendant would not give her money to fix it. The victim also stated defendant was extremely manipulative and good at "creating situations," and she was afraid that he might manipulate things to make matters look bad for her. The victim also told her friends that she had not wanted a third child, but defendant "basically forced himself upon her."

Je.W., being a lawyer, advised the victim about the divorce process. The victim felt she needed to get her financial matters in order before she could move forward; she was worried that she would be left with nothing and with no way to support her three children. The victim also told Je.W. that she did not intend to take the children away from defendant or prevent him from being around the children. She hoped to come up with a solution that was fair, and she hoped to resolve the matter through a settlement agreement rather than through a contentious divorce process.

Approximately three months before the victim was killed, she told D.E. she had discovered defendant had stopped making payments on the house, the cars, and the boat. The victim knew defendant was "keeping the money somewhere . . . ," but she did not know why. She said this made her fear for her life.

On November 9, 2011, the victim called Je.W. and indicated she was ready to move forward, and that things were happening that made her feel it was "time to do this." The victim told Je.W. that defendant, who was in Amsterdam, was planning to fake a

11

nervous breakdown with his employer so that he could take medical leave. Je.W. sent the victim an e-mail directing her to a California courts website so that the victim could fill out the paperwork to start the divorce process.

The victim began filling out divorce papers. She spent time at D.E.'s house filling out the forms on her laptop. In February 2012, the victim indicated that she was ready to file. However, she told J.W. defendant discovered the electronic document on her computer, and, according to J.W., either the document or the computer itself disappeared.[5] J.W. printed a copy of the forms so the victim could complete them by hand, and she started to do so.

The victim's father testified he learned that the victim was having an extramarital affair. He let her know he opposed it. Shortly before the victim's death, defendant called the victim's father, which was unusual. Defendant spoke to him "with this kind of high-pitched, almost fake voice, like a little child's, saying 'Daddy, what am I going to do? . . . the marriage is in trouble. What can I do? I'm desperate. I want to save my family.' " Defendant told the victim's father the victim was psychologically unstable, she was smoking, drinking, and losing weight. Defendant said the victim was having an affair and claimed she was "losing her mind." Defendant also called the victim's brother and told him she was having an affair, and that he had no one to talk to.

The victim's father saw no indication that the victim was binge drinking or having psychological problems. J.W. testified that the victim drank only moderately and that, between 2009 and her death, her drinking habits did not change. He did not detect alcohol on her breath, and did not think she was sneaking alcohol. J.W. testified that, during this time, the victim was losing weight and losing hair, but he thought it was from

---

[5] It is not clear from J.W.'s testimony whether it was the computer or the forms that disappeared. He testified: "when [defendant] came back when she was filling out the electronic divorce papers, he got ahold of the computer and it disappeared."

12

stress. However, she did not talk about suicide or depression or anxiety or anything that caused J.W. to be concerned about her mental health. They were planning a future together.

On February 5, 2012, J.W., who had been a Marine and who owned firearms, had just finished shooting target practice in his backyard when the victim's vehicle pulled into his driveway. J.W. went out front and saw defendant and her father each holding one of the children "as human shields." J.W. kept his nine-millimeter handgun under his coat because the victim had told him defendant "chased people down the street in the neighborhood with baseball bats and thr[ew] rocks at people." J.W. did not know what to expect and did not want to take any chances. Defendant told J.W., "[the victim] and I are not divorced yet. I would appreciate if you wouldn't see her anymore." J.W. said, "Fine," and the two men left. Thereafter, J.W. called the victim.[6]

The victim's father testified that it was his idea to go talk to J.W. He acknowledged he and defendant brought one of the children "as kind of a safety shield from any violence." According to the victim's father, defendant was holding a child when he spoke with J.W.

On February 26, 2012, the day before defendant killed the victim, she sent a text to J.W. saying that she had told defendant "to chill and not be so doomsdayers and dramatic about divorce. He keeps crying and pleading." She also asked J.W. if she could come over to work on the divorce paperwork. She could not stay at home while defendant was there. She told J.W., "He keeps trying to talk me into staying and saying it's all about you and I haven't given him a chance . . . ."

J.W. picked the victim up and brought her to the house he shared with D.E. The victim worked on the divorce paperwork and child support calculations. J.W. helped.

---

[6] There was no testimony about the conversation J.W. had with the victim after defendant and her father left.

J.W. testified that the California online support calculator indicated that, based on the information the victim provided, defendant would be required to pay approximately $7,800 per month. The victim asked if she could return the following morning to use D.E.'s fax machine to fax divorce papers to her attorney. D.E. agreed. The victim planned to leave defendant with her kids the next day, temporarily move in with J.W., and file the divorce paperwork.

J.W. repeatedly tried to get in touch with the victim the next morning. Eventually, D.E. called him and told him defendant had killed her. J.W. called the victim's father who confirmed that defendant killed her.

**Defendant's Characterization of the Victim as Unstable**

E.D. was defendant's supervisor at work. He recalled that, approximately two weeks before the victim's death, defendant was very depressed and he expressed concern for the victim. Defendant told E.D. that the victim was paralyzed with depression, and that defendant was trying to arrange for psychiatric care. Defendant also told E.D. that the victim had been drinking and was suffering from alcoholism. He stated that he was concerned about her ability to care for the children. Defendant told E.D. that he might need to take time off from work. On February 10, 2012, E.D. texted defendant that he hoped all was well "on the family front." Defendant responded, "trying to get [the victim] stabilized. Hard. Outcome unknown." In what E.D. thought was the last sequence of text messages he received from defendant, defendant texted E.D., "Very serious home situation. Out all week," and "Sorry." The next day, E.D. learned defendant had killed the victim.

14

**The Death of Defendant's Second Wife**[7]

At 2:00 or 3:00 a.m. on the morning of September 26, 1999, W.D. and M.H. were camping in the Chattahoochee National Forest in Georgia and were awoken by someone calling, "Help. Help. Help. My wife is dead." The two men walked towards a trail where they encountered defendant and two women. One of the women told W.D. they were afraid and did not want anything to do with the situation. W.D. said he would handle it and spoke with defendant. Defendant said he had been camping with his wife, he had been stung by a bee and had an allergic reaction, his wife was rushing him to the hospital while he lay in the back of a pickup truck, his wife lost control of the vehicle and he was ejected from it. W.D. testified defendant said "he came to because of the adrenaline from maybe the fire or something around had—had made the allergic reaction to the bee sting go away, and then he came down the mountain to our campsite."[8]

W.D. thought defendant's attire – boots and winter clothes including very thick pants and a jacket—was odd given that it was not below 60 degrees outside. M.H., who was wearing shorts, also took notice of how defendant was dressed. M.H. estimated that it was 70 degrees at the time.

---

[7] In part I. of the Discussion, *post*, we conclude that the trial court erred in admitting this evidence.

[8] On cross-examination, the defense sought to discredit the testimony concerning what defendant said caused the allergic reaction and where he was situated in the truck. M.H. initially testified defendant said he had been "stung by a bee or an ant or something or had an allergic reaction." However, on cross-examination, M.H. said defendant "did not specify exactly what had bit him," but only said he was bitten and was having an allergic reaction. W.D. acknowledged that the police report memorializing their statements (he and M.H. were interviewed together) did not mention that defendant told them he was in the bed of the truck. M.H. acknowledged he did not personally tell the deputy that defendant had said that. He said W.D. did.

W.D. stated that defendant initially seemed somewhat frantic, but as he related his story, he "went kind of very calm and just kind of going through this—this story." W.D. characterized defendant's demeanor as "maybe not . . . real legitimate concern or care."

M.H. testified that defendant was sobbing when he first entered their campsite, but to M.H., "it didn't seem believable." M.H. stated, "I don't know if it was the adrenaline that he was going through and—it was just such a hard story to believe, that I just couldn't fathom that something like that would happen. He just didn't seem to be really genuine, like he didn't convince me."

W.D. and M.H. then drove defendant back to the crash site, where they found a large area engulfed in flames. Upon their arrival, W.D, and M.H. ran down to the vehicle while defendant remained on the road. The flames were very high, and there was no way to get inside the vehicle. The whole truck was on fire. Defendant then asked the two men to take him back to his campsite, stating that perhaps his wife had walked back to the campsite after the wreck. When they did, defendant's wife was not there. They remained there for approximately five minutes before returning to the crash site to meet first responders.

W.D, did not observe any injuries on defendant and did not observe defendant limping. M.H. did not see any injuries on defendant or anything about defendant which would suggest that he needed medical attention.

Deputy Ricardo Johnson responded to the scene of the crash at approximately 4:00 a.m. He asked defendant if there was someone in the burning vehicle. Defendant responded that his wife was in or around the vehicle. Deputy Johnson recalled that defendant said he had been bitten by an insect and started having an allergic reaction and he and his wife were on their way to the hospital when the vehicle crashed. On direct examination, Deputy Johnson testified defendant first indicated he had been in the bed of the truck, but thereafter he "just stated he was in the truck." However, on cross-examination, after being shown his written report, Deputy Johnson acknowledged he first

16

wrote "in the bed of" and crossed it out because he had made a mistake. Defendant had actually told him that he had been in the truck, not the bed of the truck. Defendant said he remembered waking up halfway down the mountain and seeing the vehicle on fire. Defendant then climbed up the mountain and went for help.

Deputy Johnson asked defendant to show him the insect bite. Defendant changed the subject, stating that "his wife was down there. He didn't have time to show [him] the bug bite or anything." Deputy Johnson asked several times to see the insect bite, but defendant never did. He changed the subject each time Deputy Johnson asked. He also changed the subject when Deputy Johnson asked why he did not bring an EpiPen camping if he knew he was allergic to insect bites.

Deputy Johnson asked defendant a number of questions "about what happened, how the car got down there, what were you doing when it went down there." Instead of answering the questions, defendant repeated that his wife was down the hill in the truck. Deputy Johnson spoke with defendant for 20 or 30 minutes. He did not observe any injuries on defendant, and defendant did not complain of pain or ask for medical attention. Deputy Johnson also noted that defendant was "bundled up," wearing a long sleeve shirt and "toboggan, long pants." His attire was not seasonal for that time of year. Deputy Johnson characterized defendant's demeanor as casual. He was not upset or crying; he was "just there."

When another deputy arrived, Deputy Johnson left defendant and rappelled down to the crash site. The truck was on its passenger side. Deputy Johnson discovered a badly charred body underneath the truck, near the bed.

The responding deputies thought the circumstances were suspicious, so they called for an investigator. Detective Gerald Johnson, an investigator with the local Sheriff's office, responded. Special Agent Mike Roberts from the Georgia Bureau of Investigation (GBI) also responded and took the lead in the investigation.

17

Detective Johnson and Agent Roberts together interviewed defendant at the Sheriff's facility. Defendant stated that he and his wife had come to the camping location at approximately 3:00 p.m. the previous day, and, after a hike, they stayed at the campsite all night. Defendant had started having an allergic reaction to an insect bite including shortness of breath, swelling of his throat, and loss of muscle control. Detective Johnson remembered defendant describing prior anaphylactic episodes before addressing what happened to his wife. Defendant had experienced prior episodes that did not require medical intervention. Defendant said he forgot to bring his EpiPen on the camping trip.

Defendant told the investigators he told his wife he needed help, and she helped him to the truck. Defendant lay down in the seat while his wife drove out of the campsite. According to defendant, his wife was frantic. After driving for approximately 30 seconds, defendant felt the vehicle go off the road and roll. Defendant was not wearing a seat belt, and the next thing he knew, he awoke, the pickup truck was approximately 60 or 80 feet below him, and the surrounding woods were on fire. Defendant yelled for his wife and looked for her, thinking that she may have been thrown from the vehicle as well. After looking for approximately 20 minutes, defendant returned to the road and then to the campsite to see if she had found her way back, but she was not there. Defendant retrieved a gallon of water, went back to the crash site, and threw the water on the fire.

Defendant told the investigators he left and found another campsite where he spoke to two women and asked them to call 911. They did not have a cell phone, but they drove him to a nearby campsite where he asked some men to call 911 and to take him back to the crash site. Eventually, the two women from the first campsite drove defendant back to the crash site. Defendant said he continued to look for his wife and was calling her name when help arrived.

Defendant told the investigators that he and his wife were not having any financial problems or marital problems. To Detective Johnson, defendant "seemed very matter of

18

fact, almost distant to actually what we were there to investigate in the sense that it was almost like he was just telling a story . . . ."  It seemed that defendant brought up many subjects "other than the actual death investigation."

Detective Johnson testified that, based on his experience, he would expect to see more injuries on defendant or more evidence consistent with someone having been involved in a rollover accident that resulted in a fatality.  According to Detective Johnson, defendant only had minor injuries to his head and arm.

Detective Johnson acknowledged on cross-examination that, notwithstanding inconsistencies which raised his suspicion, no one was arrested in connection with the death.  Johnson told an insurance investigator no evidence was found to substantiate any theory other than that the incident was an accident.

The road where the accident took place was a narrow, single lane dirt road with fresh gravel.  W.D. testified that when he drove M.H. and defendant up the mountain to get to the crash site it took like what "seemed like . . . forever to get there."  It was only a mile and a half from the where they had met defendant.  As W.D. explained, "[t]he roads are a little bit treacherous there."  He had a lot of experience on that road, and testified he was always very careful when travelling on it.[9]  W.D. testified, "we went slowly up there. You couldn't drive fast," and noted that the speed limit is "maybe" 25 miles per hour. W.D. testified there are points in the road "where it just kind of falls a good long ways down" and told the jury "at high speeds, . . . the gravel . . . would cause you to have an accident."  Defendant's campsite was about one to two miles past the crash site, near the end of the road.

---

[9] W.D. testified he was very familiar with the area because he went there "practically every other weekend."  He had experience travelling on that road in a car, on foot and on his mountain bike.

The second wife's sister testified that she visited her sister approximately two weeks prior to her death. The second wife told her sister that defendant had been "hounding her to go on a camping trip," but she did not want to go. She had also told her sister that she was hoping to perform well on an upcoming physical examination because they were increasing her life insurance policy. On cross-examination, the sister testified that she was aware that defendant had a history of allergic reactions.

Prior to her death, the second wife told N.D., a coworker, that she and defendant were experiencing difficult financial times, and that defendant's startup business produced little to no income. On one occasion, the second wife told N.D. that she had a doctor's appointment in connection with a life insurance application. Approximately two weeks later, she left her job. Approximately two weeks after that, N.D. learned she was dead.

Marilyn Meixner testified as an expert in forensic auditing. Meixner investigated the second wife's USAA life insurance policy. Defendant applied for the policy in February 1999. The policy paid out on February 29, 2000, in the amount of $457,833.21, which included interest. Defendant and his wife had applied for a second life insurance policy, furnished by CIGNA, on August 19, 1999. The payout under the voluntary coverage was issued in January 2000, for $155,211.60, and the accidental death benefit of $553,753.75 paid out in March 2000. Thus, the total amount paid out on life insurance policies taken out on the life of defendant's second wife was $1,166,798.56. With regard to the Winkler's general financial status, Meixner testified that, on a monthly basis, their expenditures outpaced their income.

Dr. Fiore reviewed the Georgia pathologist's report prepared in connection with the second wife's death, as well as photographs from the scene and autopsy. The report set forth the cause of death as soot and smoke inhalation and thermal burns. Fiore testified that the Georgia pathologist did "a fairly thorough job." The Georgia pathologist concluded that the causes of death were accidental. Testing did not reveal the presence of

any volatile substances or accelerants. The pathologist also did not find any penetrating wounds such as stab wounds or gunshot wounds or other trauma that would have been masked by the burned nature of the body.

Dr. Fiore stated that the body was not found in the vehicle or near the driver's side of the car. Rather, the pickup truck was resting on the driver's side, and the body was found on her back underneath the back end of the truck by the wheel well.[10] Dr. Fiore testified that there was nothing in the materials she reviewed that would establish where the second wife had been in the truck at the time of the crash, or even that she was in the cab of the truck as opposed to the truck bed. But Dr. Fiore also testified on recross-examination, "I don't think that anybody staged that accident and put her underneath the truck and tipped it up on end. I don't think that's a reasonable scenario. [¶] I think the accident is a real – is a real thing. I just don't know where she was to start with because she was ejected, and that's true of any motor vehicle accident where somebody is ejected. It's very difficult to tell where they were positioned at the time prior to the accident." Dr. Fiore stated that there was "no evidence to support or refute," asphyxiation and that it was simply unknown. According to Dr. Fiore, the toxicological testing was not the most comprehensive, "but for what they looked at at that time, they didn't find any drugs or alcohol in her system." Dr. Fiore concluded on redirect examination that it was fair to say that "there's a lot that's just unknown."

Dr. Travis Miller, a physician specializing in allergies, testified that he had been practicing since 2006.[11] He consulted colleagues who were experts regarding issues

---

[10] Dr. Fiore's testimony that the truck was resting on the driver's side conflicted with Deputy Johnson's testimony that the truck was found on its passenger side.

[11] Dr. Miller received his undergraduate degree, went to medical school, and completed his medical training in California. He did not testify that he had any experience with allergies or allergic reactions related to the Georgia woods where the crash took place.

21

relating to anaphylactic shock and epinephrine. Dr. Miller testified that it was difficult to say whether a person experiencing an anaphylactic reaction could recover without treatment. He clarified, "If it's truly anaphylaxis and you have a combination of two symptoms, I guess, theoretically, it's possible that someone could." He continued, "with the lower grades of allergic reactions, some people we know, by experience, that do experience symptoms don't administer epinephrine and can live through the event." However, with higher grades of anaphylaxis, it would be unlikely for the person to survive without treatment. Presented with a hypothetical scenario where a patient suffering an allergic reaction presented with shortness of breath, swelling in the throat, loss of muscle control, feeling woozy, and loss of vision, Miller testified that he would not expect the person to recover without epinephrine or other treatment. Miller testified that he had never seen a patient recover from similar symptoms without intervention, but noted the "caveat" that when he sees a person in that condition, he administers epinephrine. Miller also testified that he had never seen nor heard of a situation where someone had an allergic reaction to an insect bite which was sufficient to render them capable only of crawling to their car to try to get to a hospital, yet, one hour later, that person had no signs of any bite.

### Defendant's Statements about the Second Wife's Death and Her Ashes

J.W. recalled the victim telling him that defendant's second wife died when they were driving in Georgia. She told J.W. a bee flew in the vehicle and stung defendant, he lost control of the vehicle and was thrown from it, and the vehicle crashed and burned. J.W. also recalled the victim telling him that defendant "walked away without a scratch," and that he received a $630,000 life insurance payment. The victim's father also recalled her telling him that the second wife had been killed when the car she was in went over a cliff, "and that [defendant] escaped pretty much unscathed."

E.D., defendant's supervisor, recalled defendant telling him that his second wife had died in a car crash. Defendant told E.D. that he had been stuck in the car and

22

unconscious and there was a fire. Defendant regained consciousness and was able to get out of the car, but his second wife did not make it. E.D. did not recall defendant telling him anything about having been bitten.

The victim told several people, including her father, Je.W., J.W., and D.E. that, at some point, she found the second wife's ashes in a box in the garage. According to the victim's father they were "next to some greasy airplane parts on the shelf . . . ." In each account, the victim shared an exchange she had with defendant upon finding the ashes and asking defendant if that "what's going to happen to me someday" or words to that effect. She told her father defendant replied, "No. Just don't make me—not if you don't make me angry." She told Je.W. defendant responded by saying something like, "[i]f you don't get out of line, then you won't." She told J.W. defendant responded, "You're not going to get in my way, are you?" She told D.E. defendant responded, "Not if you watch yourself." The victim said defendant's response made her feel nervous and afraid.

Three days to a week before the victim was killed, she told D.E. she intended to seek a restraining order against defendant. When D.E. asked why, she responded that defendant had told her in the preceding week, "If you divorce me, you'll wind up like my second wife."

### Additional Incidents Causing the Victim to Fear Defendant[12]

The victim's brother testified that, on one occasion when he went out with his girlfriend, defendant, and the victim, defendant described a time when he got what he felt to be a bad deal on an airplane which he felt put his life in danger. Defendant demonstrated what he wanted to do to the person involved in that transaction by grabbing the victim around her neck and shaking her violently. Defendant released her, betraying

---

[12] As will be discussed in an unpublished portion of this opinion, part II. of the Discussion, the defense moved in limine to exclude *some* of the victim's statements evincing her fear of defendant, but did not object to all of this evidence.

23

no awareness that he had hurt her, and then went to the bathroom. When defendant left, the victim began to cry.

E.D. recalled attending a conference with defendant in Amsterdam in 2011 where defendant was scheduled to make a presentation to 300 to 400 people. E.D. reviewed defendant's plans for the presentation several days prior to traveling to Amsterdam and told him that the presentation needed to be more limited. On the Sunday night before the conference was to begin, another employee brought E.D. to defendant's hotel room where defendant had been found by a maid incapacitated or paralyzed. Defendant was taken to the hospital, and E.D. gave the presentation. The victim told J.W. and her father that defendant staged this incident.

The victim also told J.W. and her father that defendant was considering staging an accident in which he would dive out of his Mustang at the last minute and the car would be destroyed. Defendant intended to sue his employer, claiming that the lawsuit would be worth $23 million because he was working 20 hours a day, six days a week at that time.

The victim told Je.W. and her other friends during the girls' weekend that, on one occasion when she was on vacation, a man hit on her, and defendant "beat that person to a bloody pulp and left them there, and she wasn't sure if they were alive or dead." J.W. testified that, according to the victim, during her honeymoon in Bali, defendant assaulted a tour guide who had "goosed" the victim. The victim said defendant beat the man and may have killed him.

J.W. also testified that the victim told him she and defendant were on their honeymoon in Australia scuba diving at night in 60 feet of water. Defendant, who had the only light, left. The victim was left disoriented and frightened, and this experience made her afraid of defendant. The victim told her father a similar story, where she said she had to swim for her life to get back to the boat.

24

The victim also told J.W. that, while she was riding on the back of a motorcycle with defendant in New Mexico, defendant tried to throw her off. She said defendant accelerated and she nearly fell off.

When they first began their romantic relationship, the victim told J.W., "[i]f anything happens to me, I want you to look at" defendant.

### Defendant's Evidence

### Prior Allergic Reactions

M.Hd. attended the Air Force academy with defendant, and after graduation they were both stationed in Texas. M.Hd. was boating with defendant when defendant was bitten by an insect. Defendant began sweating profusely, complained of dizziness, and grew incoherent. Defendant laid down on the boat while M.Hd. navigated to shore. M.Hd. had to assist defendant to the truck because he was wobbly on his feet. He turned on the truck's air conditioning and got defendant some ice and cold water. Defendant did not want to go to the hospital and stated he just wanted to go home. As defendant cooled off in the truck, drank water, and iced the insect bites, his condition improved. The next day, defendant was fine.

### Defendant's Injuries after the Crash

Regarding the crash involving defendant's second wife, Dr. Albert DiVittorio testified that defendant's injuries were consistent with being thrown out of a vehicle and within the range of what one could expect. DiVittorio emphasized the sloping nature of the topography and the brush in the area which would have gradually slowed defendant down.

### Defendant's Testimony

Defendant testified he attended the United States Air Force Academy, and became an F-16 fighter pilot. He married his second wife while he was stationed in Florida, and was later reassigned to Japan.

While stationed in Japan, defendant developed carpal tunnel syndrome which prevented him from flying. Defendant was angry and frustrated as a result of this setback. Approximately three months later, he was called into his commanding officer's office and informed that he had been filmed shoplifting at a base store in Korea where he had been two days earlier. Defendant had an angry, emotional outburst. He testified that, prior to being confronted about the incident, he had no recollection of walking out of the store without paying for items. This is an example of what defendant described as his occasional instances of amnesia. As a result of this incident, defendant was hospitalized and treated by psychiatrists for three or four months in Hawaii. Defendant spent another four months in treatment in the Washington D.C. area. He was honorably discharged and he and his second wife returned to Florida.

Thereafter, defendant and his second wife moved to Georgia, and defendant started his own business. They were planning to have a family.

Defendant testified that he had experienced symptoms of an allergic reaction on the boat as described by M.Hd. Following that episode, defendant recovered after resting, and he was not treated by a doctor or in a hospital. On another occasion, defendant was in his front yard in Tampa when he began to feel nauseous and sat down. Defendant looked down and saw ants on his ankle. After removing the ants, the nausea increased and defendant began to experience tightening of the throat and difficulty breathing. Thereafter, he walked into the house and collapsed. He crawled into the kitchen, and his second wife called 911. Defendant was transported to the hospital and treated by EMTs on the way. A physician prescribed defendant an EpiPen. Defendant had another allergic reaction while at his home in Georgia.

Defendant testified that he and his second wife enjoyed outdoor activities including hiking, camping, and skiing, both in Japan and in Georgia. Contrary to the testimony of her sister, the second wife did want to go on the camping trip.

26

On the first night of the camping trip, his wife invited Ranger David Shattock to eat dinner with them, but he declined. Later, after they went to sleep, defendant woke up and left the tent to urinate. After he returned, he felt the symptoms of an allergic reaction, including shortness of breath, tightness of the throat, and weakness. Defendant woke up his wife and alerted her to his condition. She assisted him in getting into the passenger seat of the truck, and he reclined. She then drove to the road.

At some point, defendant felt the truck beginning to roll over. The next he knew, he was lying on the ground in the midst of a fire. Defendant could see the truck in the fire and realized that he had been in an accident. He feared his wife might be in the fire, but he also thought it possible that she, too, was ejected from the vehicle. He began to search the area and tried try to get near the truck to locate her. He could not see whether she was in the truck, as it was engulfed in flames. He testified that he spent approximately 20 minutes searching the area, and then he went up to the road.

Thinking that his second wife may have made it out of the truck and returned to the campsite, defendant went there, but she was not there. Defendant grabbed a jug of water from the campsite, returned to the fire, and tossed the water on the fire as a "nonsensical effort at fire fighting." Because he did not have a cell phone, defendant went to look for help.

Defendant went downhill toward other campsites and came upon the campsite of two women. Defendant yelled that there had been an accident and said he thought his wife was dead. The women did not have a phone, so they had defendant ride in the back of their truck and drove to another campsite. Defendant approached W.D, and M.H.'s campsite, yelling that his wife was dead, he needed help, and asking them to call 911, which one of them did. Defendant began to walk back to the site of the accident. According to defendant, the two women gave defendant a ride back to the accident site, and W.D, and M.H. followed in their vehicle.

27

Defendant and one of the men searched the area for 15 to 20 minutes. Defendant could not get closer than 100 feet from the vehicle. He decided to check their campsite again, so he went there, accompanied by W.D. and M.H. She was not there, so they returned to the crash site.

As defendant arrived back at the scene of the crash, law enforcement and firefighters were arriving. Other than W.D, and M.H., the only people defendant had contact with at the scene were the two deputies. Deputy Johnson informed defendant that he had seen his wife's body.

Defendant testified that, when Deputy Johnson asked to see the bug bite, defendant responded that he did not know where it was. He said he did not know what caused his allergic reaction.

Agent Roberts later interviewed defendant for 30 to 45 minutes. Defendant showed Roberts his injuries, including his swollen hand, scrapes on his forearm, his knee, and a contusion and scrape on his forehead. Defendant's jacket was torn. During the interview, defendant was asked where he was bitten, and he again responded that he did not know. Defendant said he never determined the cause of his allergic reaction.

Defendant denied that he was wearing boots, heavy pants, a heavy jacket, and a stocking cap when he encountered W.D. and M.H. He said he was wearing a T-shirt, a medium-weight jacket, and cargo pants.

Defendant denied killing his second wife. He also denied that any medical appointment she attended in the weeks prior to her death was for purposes of obtaining life insurance. There was only one life insurance policy which required a medical examination, and that had been completed in November or December 1998.

Defendant later relocated to the Bay Area. He met the victim in July 2005, and they married three weeks later. Defendant's company relocated him to Australia where they remained for 13 months.

Defendant acknowledged he kept some of his second wife's ashes in a box in his nightstand. He testified he never stored the ashes in the garage. According to defendant, the victim did confront him about the ashes. She asked defendant why the ashes were in the bedroom, and defendant replied that he thought it was an okay place to keep them. He testified the victim never asked him if she was going to end up like that, and he never told her that she would if she did not do as he said.

Defendant denied that his baby son was conceived as a result of him raping the victim.

He testified that, in 2010, he first began to suspect that the victim and J.W. were involved in a relationship. Sometime thereafter, defendant received a telephone call from J.W.'s wife. She told defendant that J.W. and the victim were having an affair, that J.W. was dangerous, and that defendant should be careful. She told defendant that J.W. possessed "an arsenal of weapons . . . ." and that he was no longer able to work in corrections because he had a violent altercation while employed in law enforcement. The victim confirmed to defendant that J.W. owned guns and that he had a violent altercation while in law enforcement. She also confirmed the affair and how long it had been going on.

On the suggestion of the victim's father, defendant and the father went to J.W.'s house to confront him and tell him to "lay[] off." Defendant acknowledged that he was holding one of his children when he did so, but denied holding her as a human shield. The father was holding defendant's son.

According to defendant, after he confronted J.W., the victim seemed more amenable to, even eager for, reconciliation. Defendant and the victim formed a tentative plan to move to the city where her father lived. They viewed some rental properties there. Ultimately, the plan did not come to fruition, as the victim and J.W. resumed their relationship.

29

Defendant testified that he and the victim were not sexually intimate in the month of February 2012. This corresponded with the resumption of her relationship with J.W. According to defendant, the victim changed dramatically that month.

In December 2011, the victim had told defendant she planned to leave, but she stated that defendant could keep the children. Therefore, as of February 26 or 27, 2012, defendant believed that, in the event he and the victim separated, custody of the children would be resolved amicably and fairly.

Defendant testified that, as of February 2012, the victim was "lashing out, and confrontational and combative." She started smoking cigarettes and started "doing a little bit of day drinking, not much, but some day drinking." While the victim previously had been a capable mother, in the month of February, when defendant would come home on Fridays, he would find her "highly inebriated with the kids in the house." She also stopped taking the children to their social activities, and she stopped breast feeding the baby. She told defendant that she did not even want the children, which was shocking to defendant. She also stopped engaging in her own social activities.

On the night of February 26, 2012, the victim came home and told defendant she intended to have the children 100 percent of the time, and defendant would only be allowed to visit them. Previously, they seemed to agree they would share equal custody of the children.

Defendant got up at approximately 3:00 a.m. the following morning to go to work. Later, he went into the victim's bedroom. Defendant got in bed with her. He told her that her having the children 100 percent of the time was unacceptable. According to defendant, the victim responded, "I'll get [J.W.] to come over here and take care of you." Defendant perceived this as a death threat. Defendant testified, "I knew she was spinning out of control, but I didn't know it had gotten to this point."

Defendant hit the victim with a partially closed fist on the left side of her face. The victim sat up and turned away from defendant with her feet on the floor, and

defendant started to rub her back and apologized.  The victim turned around and lunged at defendant with scissors with the blades open.  She thrust the scissors at defendant, and defendant put his hand up between the blades to block them.  Defendant and the victim wrestled, each attempting to control the scissors.  He felt endangered.  He testified he sustained injuries to his hands, and the victim sustained cuts from the scissors on her chest and face.  He poked the victim's left eye with his thumb, she bit his hand, and defendant fled the room and ran to the garage.

In the garage, defendant thought "maybe leaving this situation isn't the best.  Maybe I need to get the children out of here."  Because of the victim's purported binge drinking and the fact that she just attacked him with scissors, defendant decided to collect the children and remove them from the house because they were not safe there.  Their son was in his crib in the victim's bedroom, and defendant testified he thought it urgent to get him away from her.  Defendant was particularly worried about his son and believed he was in danger because the victim had a "weird" relationship with him as he was the result of an unwanted pregnancy.  On cross-examination, defendant testified he thought it was possible that the victim was capable of killing their son.  However, he also acknowledged that she had never shown aggression towards the children and had never harmed them.  He also acknowledged that he did not call 911 after he left the room.

Defendant ran back to the bedroom where he saw that the door was closed.  He thought the victim might be on the other side of the door, holding it closed.  He returned to the garage and put on his motorcycle jacket because it had crash padding and would protect him if he broke the door in as well as against scissor attacks.

Defendant again returned to the bedroom, turned the doorknob, and put his shoulder into the door.  He fell into the room onto the floor and landed at the victim's feet where she was seated on the floor with her legs in front of her.  He testified that the victim kicked him in the head.  Defendant said he "crawled up [her] body . . . ," and she began to fight back.  He testified he felt a sharp pain below his waist, and later discovered

31

that he had been cut on his left thigh. Defendant said he grabbed the victim by the throat and then noticed she was holding the scissors. He testified they struggled over the scissors again as they rolled around on the floor.

Defendant turned the scissors toward the victim and jabbed at her face and chest. According to defendant, the victim then got control of the scissors, and he grew concerned that he "might not win this battle." He felt as though they struggled for 20 minutes, although he testified that the struggle probably lasted only four to five minutes. He testified he was exhausted and had no energy remaining. He felt that he was in a "kill or be killed" situation.

Unable to use his right arm and right hand, defendant testified he bit the victim's arm. Defendant slid his head up the victim's arm and bit the back of her left hand. With his left hand, defendant overpowered the victim's right hand. Defendant then pushed the scissors into the left side of her neck. As this began to happen, the victim told defendant that she wanted to resolve everything, that she was willing to reconcile and that she wanted to remain together. Defendant did not respond because he could not speak. He did not stop struggling, because he believed that if she gained the upper hand, she would kill him. He believed that if he did not kill her, she would have obtained control over the scissors and he would not have the ability to defend himself. Defendant pushed the scissors into the victim's neck, killing her. He then lay on top of the victim for what felt like a long time. Thereafter, he pushed himself off of her and cried.

On cross-examination, defendant acknowledged that the victim had begged for her life, and, at that point, he wanted her to die. Defendant agreed that he told law enforcement that he did not have to "take it that far," although on redirect, he testified he meant he "should have had the strength to disable her and get the child and get out of the room without having it erode or degrade into a life-or-death situation."

Defendant acknowledged that he did not tell law enforcement he was unable to move his right hand and arm during the incident. He also acknowledged that he told law

32

enforcement he pushed the scissors into the victim's neck with his left hand while pulling her in with his right hand.

He admitted the victim was not a violent person. He also acknowledged she had never threatened him or anyone else.

Defendant admitted that, after killing the victim, he did not call police right away, but instead "start[ed] processing what's happened." He burned a bottle of cleaner, rubber gloves, a scrub brush, and paper towels. On redirect, defendant testified that he did that because he realized it looked bad, as though he was trying to manipulate the crime scene. He said six and a half hours passed between defendant killing the victim and calling D.B.

At some point after killing the victim, defendant sent a text message to E.D., stating, "Very serious home situation. Out all week. Sorry." He testified he sent this message "as a professional courtesy" to let E.D. know that he would not be at work.

Defendant claimed he cleaned and bandaged his hands before going to the J.s.

He testified that the victim handled household finances, and he did not prevent her from accessing or using any funds. She never complained she did not have enough money for her needs and the needs of the children. There was only a $25,000 policy on her life.

Defendant denied that any incident occurred on their honeymoon where he nearly beat a man to death for acting inappropriately toward the victim. Although she did ride on the back of his motorcycle on numerous occasions, defendant did not recall an incident where she nearly fell off. Defendant also denied chasing a contractor down the street while holding a baseball bat. He testified he did not recall the incident described by the victim's brother, in which defendant purportedly described being cheated on an airplane deal and grabbed the victim by the throat.

Regarding the Amsterdam trip, defendant testified that he was to deliver a major presentation. However, once he arrived in Amsterdam, he was directed by executives, who did not have a full understanding of the presentation, to reconfigure it. Defendant

worked on revising the presentation for 72 hours straight until he collapsed in his hotel room. He was taken to a hospital where he was treated over six days for psychosomatic disorder. Defendant experienced paralysis of his limbs and inability to speak. He denied this episode was a scam or was perpetrated to defraud his company, or that he told anyone as much. However, defendant acknowledged on cross-examination that, when paramedics arrived, his vital signs were fine.

Defendant also denied planning a scheme to obtain money from his company by staging an automobile accident. However, based on how he felt he was mistreated in connection with the presentation, defendant did tell the victim that he wanted to file a lawsuit. Ultimately, he decided not to pursue the matter.

Defendant testified that, when he worked for a previous employer, he was having inappropriate verbal outbursts with other employees and he was being reprimanded for his conduct. He was told to attend anger management classes, although he did not do so. He pretended to have cancer so that he could work from home and avoid these situations. Defendant used the same ruse when he later worked for E.D. Defendant testified he had discovered the affair between the victim and J.W., and he could not be in the office in his emotional state.

On cross-examination, defendant testified that, although he had lied in the past, he was not lying in his testimony. He testified that J.W. was not truthful about some things in his testimony. D.E. and the victim's father were "untruthful about some things," and the victim's brother, E.D., Deputy Johnson, Detective Johnson, W.D., M.H., and N.D. were all "[l]ess than truthful." According to defendant, the J.s were "as truthful as [they] could be" There were aspects of his second wife's sister's testimony with which he disagreed. He testified that the victim lied. But, again, defendant testified that he told the truth about everything.

34

**Expert Testimony Concerning Defendant's Mental Heath**

Dr. Frank Lossy, a psychiatrist, psychoanalyst, and forensic psychiatrist, testified as an expert. Lossy reviewed investigative reports and other materials, including defendant's military records, records from defendant's hospitalization in Amsterdam, and defendant's interview with police. Lossy also interviewed defendant on three occasions.

Lossy testified that the medical personnel who prepared defendant's military records in connection with his psychological treatment concluded that defendant suffered from a dissociative disorder, or a state of mind which is dissociated from the subject's normal state of mind. Such a state can cause the subject to experience amnesia. In defendant's case, the diagnosis of dissociative disorder was supported by a period of amnesia with no physical pathology in the brain or central nervous system to account for it.

With regard to the Amsterdam incident, Dr, Lossy testified that defendant experienced outrage at the developments concerning the presentation. Lossy opined that, when defendant was admitted into the hospital in Amsterdam, he was suffering from conversion disorder, by which the subject copes with a situation he or she deems unacceptable by developing an abnormality of the motor or sensory apparatus. The physical symptom is not caused by any physical pathology, but is purely a mental phenomenon. According to Dr. Lossy, defendant's condition resulted from an inner conflict about anger.

Dr. Lossy's opinion was that, at the time of defendant's struggle with the victim resulting in her death, defendant was suffering from elements of both a dissociative disorder and a conversion disorder. He opined that defendant's mental disorder could have been a factor in causing defendant to act the way he did which resulted in the killing of the victim. Dr. Lossy further opined that defendant's mental disorder could explain defendant's conduct between the victim's death and when police were contacted.

35

## Stipulations

The parties stipulated that, if called, Dr. Frederick Hellman would testify that "it is possible to have an allergic reaction to a bug bite or something breathed and recover without treatment. This is referring to common allergies. [¶] In answering the question as to whether someone can recover from anaphylactic shock without treatment, he would say he would not be . . . able to answer that question without first doing some research on the issue."

In another stipulation, the parties stipulated that Ranger David Shattock stated, "On Saturday evening, 9-25-99, I went by the campsite of [the Winklers]. I talked briefly with the Winklers from my pickup truck. Ms. Winkler asked . . . me to come down and have some sausage, that she was cooking with them. I did not go eat with the Winklers. Everything seemed fine with the Winklers when I left them."

The parties agreed that, during the interview with Detective Johnson and Agent Roberts in 1999, defendant " 'was emotional and had injuries to his left knee. His left hand was swollen and hurting. His jacket was torn at the right shoulder. His forehead was scraped and bruised. There was a large scrape and bruise along the right forearm up to the wrist area.' "

## Verdict and Sentence

The jury found defendant guilty of murder in the first degree. (§§ 187, 189.) The jury also found true the personal use of a deadly weapon enhancement allegation. (§ 12022, subd. (b)(1).)

The trial court sentenced defendant to 26 years to life, calculated as follows: 25 years to life for murder in the first degree (§§ 187, 189), and a consecutive one-year term for the personal use of a deadly weapon enhancement (§ 12022, subd. (b)(1)).

## DISCUSSION

### I. Evidence Concerning the Second Wife's Death –
### Evidence Code section 1101, subdivision (b)

### A. Defendant's Contentions

Defendant asserts that the trial court erred in admitting evidence of the 1999 uncharged death of his second wife under Evidence Code section 1101, subdivision (b) (section 1101(b)) as evidence proving his intent to kill the victim here, absence of mistake or accident, and to negate self-defense. He asserts that the uncharged death of his second wife had no tendency to prove his intent to kill the victim. He further asserts that the prosecution "conjured up" a murder where there was no evidence that he turned the steering wheel or struck his wife, causing the vehicle to go over the embankment as the prosecution speculated. He contends that the grounds on which the prosecutor relied in the trial court in arguing the admissibility of the evidence, such as witnesses' conclusions that "there was something that wasn't right," and that "[n]othing made sense," amounted to pure speculation. He emphasizes that the 1999 incident was ruled an accident by the Georgia authorities and no charges were filed. He also asserts there were no similarities between the death of his second wife and the charged offense substantial enough to have any significant probative value. He acknowledges the similarities upon which the trial court relied, but argues they are without significance.

Defendant further asserts that even if this evidence was relevant, it should have been excluded pursuant to Evidence Code section 352 (section 352), because whatever probative value it had was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, and of misleading the jury. He also asserts that the error in admitting this evidence violated his right to due process and was prejudicial, in that he was essentially forced to defend himself against a second murder.

We agree with defendant that the trial court abused its discretion in admitting the evidence pertaining to the second wife's death. However, we further conclude that based on the admissible evidence, defendant was not prejudiced by this error.

## B. Additional Background

### 1. The Prosecution's Motion

In a pretrial motion, the prosecution argued the evidence was admissible to prove defendant's intent to kill, contending that defendant had placed his intent to kill at issue by claiming he killed the victim in self-defense. The prosecution asserted that the death of his second wife and this case bore the following similarities: the decedent was married to defendant; defendant offered innocent explanations in each case; defendant walked away from each incident essentially unharmed despite the underlying violence involved; both killings were preceded by financial hardship; and defendant stood to benefit financially as a result of both killings. According to the prosecution, these similarities satisfied the threshold of the "least degree of similarity" necessary for the introduction of uncharged misconduct evidence to prove intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) The prosecution also asserted this evidence was admissible to prove absence of mistake. As a separate theory, the prosecution asserted that the evidence was admissible under the doctrine of chances, which holds that the more often one does something, the more likely that doing so was intended.[13]

The prosecution further asserted that section 352 did not bar the admission of this evidence. It argued its probative value was not substantially outweighed by the

---

[13] The prosecution did not argue that the evidence of the second wife's death was admissible to show the absence of accident related to the charged crime. The trial court, nevertheless, included that theory in its instruction about how the jury could use the uncharged act evidence. While defendant's claim of self-defense could entail the concept of mistake (mistake in the need to defend or to use the level of force used), we do not see how the defense of accident applies here. However, defendant makes no specific contention as to this matter, and accordingly, we shall not discuss it further.

probability that the admission of the evidence would necessitate an undue consumption of time, or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The prosecution argued the evidence had additional probative value because it was "cross-admissible," in that it related to the statements defendant made to the victim when she asked about the second wife's ashes and that defendant was planning to stage a vehicle accident. Additionally, the prosecution argued "the circumstances of both wives' death show an overall pattern of deceit and lies by defendant."

In opposing the motion, defendant maintained he did not commit the prior act alleged to be uncharged misconduct. He marshaled evidence from law enforcement and insurance investigation reports, and asserted that the evidence demonstrated the death of his second wife was an accident. An insurance investigation report submitted to the trial court as part of defendant's opposition stated: "An extensive interview was conducted with the GBI special agent who has also advised that they have received no information which is contrary to what the beneficiary has reports [*sic*]. The GBI agent also advised he felt that this situation was nothing more than an unfortunate accident." The report from a second insurance company indicated the GBI agent said they could not disprove anything defendant told them and there were no signs of foul play nor evidence indicating defendant was responsible for his second wife's death. Based on the evidence, the GBI agent told the second insurance company's investigator, "it just appears to be a sad and tragic accident, with no foul play involved." A GBI arson investigator also ruled out "foul play."

The defense also proffered information from the Georgia pathologist, who stated he found "no evidence of foul play." Additionally, the pathologist stated, "It is possible to have an allergic reaction to a bite or something breathed and recover without treatment." He added that a person could have an allergic reaction to various plants in the woods, and allergic reactions to insects and plants in the area are not uncommon.

Defendant also proffered documents and photographs indicating that the injuries he suffered were not inconsistent with his description of what happened, disputing the prosecutor's representations that he walked away from the incident "unscathed." The GBI agent noted one of defendant's knees was swollen twice the normal size and he had scrapes along his arms. The injury to his left arm was described as a "large scrape" and bruise. His left hand was also swollen. His forehead was also scraped and bruised. None of the reports or proffers of evidence before the court indicated defendant's injuries were inconsistent with his description of what happened.

The GBI investigative report noted the mountain road on which defendant and his second wife had been travelling was a narrow, single-lane road with ravines on the edge. The GBI agent told insurance investigators that the mountain road was "extremely slick."

Addressing similarity, defendant asserted that the accidental death bore no similarities to the instant case beyond the fact that he was married to both decedents. He argued that admission of evidence based on the doctrine of chances depends on the existence of prior similar acts as a "foundation for a probability based calculation." He asserted that, because there was no prior similar act here, the evidence of his second wife's death was inadmissible.

Finally, defendant asserted that the evidence should be excluded under section 352. He argued this evidence would essentially entail a second murder trial, which would give rise to undue consumption of time, including testimony by accident reconstruction experts, road engineers, and insurance investigators.[14] He argued this was "a classic example of the need for . . . section 352 protection to avoid the undue consumption of time, avoid substantial danger of undue prejudice, confusing the issues and misleading

---

[14] Ultimately, the defense offered no testimony from reconstruction experts, road engineers, and insurance investigators.

40

the jury" and that "[a]ny probative value of the dissimilar 1999 accident is far outweighed by its prejudicial effect."

In reply, the prosecution asserted that the "jury should be the final authority on what facts they find true." The prosecution also argued the court should look to the law of joinder, asserting that area of the law would provide "insight" here. It also argued that the evidence of the victim's state of mind to establish that the defendant was the initial aggressor would be admissible, and thus there was cross-admissibility regarding statements made by the victim establishing her fear based on what had happened to defendant's second wife.[15]

## 2. The Hearing on the Motion

At the hearing, the court noted that the 1999 incident had been determined by the Georgia authorities to be an accident. When the trial court asked the prosecutor to explain how defendant caused the crash, the prosecutor responded, "we'll never know exactly," because he was the only witness. She stated that defendant had said he had an allergic reaction to a bug bite requiring that he go to the hospital and that is why his second wife was driving. She asserted that defendant had provided different versions of where he was in the vehicle at the time of the incident. "So he's somewhere in the car, and he pushes her – pushes the car or gets her out and turns the – or gets out, turns the wheel. Who knows exactly how he managed –" The trial court interrupted, stating that it required a plausible theory and opining that it would not be easy to do what the prosecutor alleged. The court stated, "I need some kind of workable theory as to how he

---

[15] In this appeal, the People do not advance the prosecution's "cross-admissibility" theory concerning the victim's fear stemming from statements she reported defendant made concerning the second wife's death. We note that the statements were essentially related to the victim's inquiries of defendant as to whether she would end up as ashes in a box, which did not require the breadth of evidence introduced regarding the Georgia incident. In any event, since the People do not advance the prosecution's theory on appeal, we have no reason to consider it.

got out of the car so much earlier, almost unscathed, and his [second] wife ends down at the bottom of the ravine and then she burned to death." The prosecutor responded, "There could be 800 ways that he did this" and proffered: "It's his wife. He could tell her to stop the car. He needs to throw up. Who knows what his excuse was . . . why he needed the car stopped. He gets out and puts it into drive, turns the wheel, and, you know, punches her. [¶] I mean, there could be many ways. He turns the wheel himself. He could be – they could be driving along, and he has his car – he has his door unlocked, ready to go. He's driving along. He swerves the car and jumps out, you know, taking control of the car himself, swerving the car, and jumping out. What's – I mean, there are many different ways that he could have gone about doing it." Later, the prosecutor argued, "How do we know that this [d]efendant wasn't the one that was driving, driving her off?"

The court disagreed that there were many ways defendant could have engineered the crash, but agreed that he could have been in the seat, steered the wheel down the embankment and jumped out. "I guess that's doable. But I don't think there's 800 ways this could be done." The court added, "It's kind of a difficult thing to do, to be honest" and "it sounds like it would be somewhat difficult to get a car all the way down there to the point where it kills one party and the other one is suffering only minor injuries." The prosecutor stated that, although the incident had been ruled an accident, "every law enforcement person and every civilian that we have interviewed has said that they knew there was something that wasn't right. Nothing made sense." According to the prosecutor, "[t]hey couldn't say for sure what happened, so they had no choice but to ultimately rule it an accident."

The trial court first considered the three-part analysis courts employ when deciding whether to admit uncharged act evidence, beginning with the materiality of the

42

uncharged act evidence.[16]  The court observed that defendant's intent was at issue, as was his related claim of self-defense.  Based on that, the trial court concluded that the materiality of the uncharged event was "significant."

As to the probative value of the uncharged misconduct evidence, the court told the prosecutor, "I'm having a little trouble here."  It noted that the detective who investigated the incident appeared to be "fairly comfortable" concluding that the incident was an accident, and the arson investigator and the pathologist likewise determined the death was accidental.  According to the trial court, based on the evidence submitted in the motion and opposition, not one agency involved in the investigation "pushed this for a homicide."  The court told the prosecutor that while the circumstances sounded "fishy," that did not make the event a homicide.

The prosecutor argued that, for evidence to be admitted pursuant to section 1101(b), the prior uncharged misconduct need not have resulted in prosecution, and could even be a crime for which there was an acquittal.  When pressed by the court on how she would demonstrate that the death was indeed a homicide as opposed to an accident, and thus probative, the prosecutor listed the following circumstances:  the second wife hated camping and did not want to go; defendant had recently taken out new life insurance policies on her; defendant had just substituted a "fake ring" for her diamond wedding ring;[17] they went to a remote location; defendant, who was a former fighter pilot, was

---

[16]  As discussed in more detail, *post*, "the admissibility of uncharged crimes depends upon three factors:  (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other section 352 concern)."  (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).)

[17]  In his opposition to the prosecution's motion, defendant asserted that they had purchased a ring with a more modern setting to replace his second wife's antique style ring.  The new ring had been delivered with a Cubic Zirconia stone.  The plan had been to

trained in survival skills and "knows how to handle himself in a situation like this"; he did not bring a cell phone or EpiPen on the camping trip; when defendant approached two individuals' campsite for assistance, he seemed suspicious to them because he was not acting as though anything was wrong; law enforcement did not initially observe any injuries on defendant; when asked, defendant did not show law enforcement the insect bite which allegedly caused him to go into anaphylactic shock; the notion that defendant could recover from an anaphylactic episode without any treatment was not credible; and defendant only exhibited injuries after he had been outside of the presence of law enforcement for a period of time. The prosecutor noted circumstances in the charged case, including that defendant initially had no injuries but, after some time to himself, he had minor injuries, which the prosecutor asserted were self-inflicted.

The trial court then turned to Evidence Code section 352. The court expressed skepticism about whether the People could present this evidence within one day, as the prosecutor claimed in her moving papers, thus avoiding undue consumption of time. The prosecutor asserted that, even if the matter consumed two days of trial, it would not constitute undue consumption of time in the context of what was expected to be a long trial.

Regarding points of similarity, the trial court noted: (1) both decedents were married to defendant; (2) both suffered "violent deaths;" (3) defendant was the only other person present; (4) the injuries suffered by defendant were minor given what would be expected if the events occurred as defendant claimed; and (5) defendant stood to gain financially in both cases, in the prior situation based on life insurance proceeds, and in this case because the victim intended to divorce defendant, which would be costly, and she intended to seek spousal and child support. The prosecutor added to these similarities

_____

replace the Cubic Zirconia that came in the modern setting with the diamond from the antique style ring, but his second wife had not gotten around to doing that. Nine months passed, during which defendant did not sell the old ring or its diamond.

44

that, prior to each incident, the defendant and his wives were experiencing financial hardships.

In opposition, defense counsel asserted that the prosecutor's arguments were based on "assumptions and speculation." Defense counsel also emphasized that, in controlling case law relied upon by the prosecution, the killings themselves bore substantial similarities to each other. For instance, in *People v. New* (2008) 163 Cal.App.4th 442 (*New*), both of the defendant's wives were "shot in the head" while they were asleep. (*Id.* at p. 446.) The court acknowledged that the offenses in *New* were "very, very similar," but noted the *New* court stated the most important similarity was the fact both victims were the defendant's wives. Defense counsel responded that is the only similarity present here.

After defense counsel pointed out the similarities in the manner and circumstances of the killings in *New*, the trial court asked "should a defendant who's smart enough to do two killings in different methods benefit from the fact that he didn't shoot both victims or didn't stab both victims?" Defense counsel acknowledged that the mere fact of killing two different victims in two different ways would not automatically result in the inadmissibility of the evidence. But here, there were no similarities between the two events, and evidence of the second wife's death was irrelevant to defendant's intent here.

Focusing on one of the suspicious circumstances, defense counsel argued that the Georgia pathologist noted it was not unusual to have an anaphylactic reaction from a bug bite or from something he breathed in the woods and it was possible for the reaction to clear up without treatment. Additionally, there were other incidents in defendant's life where he suffered from anaphylactic reactions. Counsel also emphasized there was no evidence of any trauma to the second wife other than the injuries resulting from the vehicle crash and fire.

In reviewing the points of similarity with defense counsel, the court stated: "I've never heard of anyone receiving such minor injuries," as in the Georgia incident and "that

45

would be true of the stabbing too."  The court stated the belief that in both situations, defendant would have received more serious injuries if events occurred as he claimed.

### 3.  The Trial Court's Ruling

The trial court concluded that the evidence was material, as defendant's intent and whether he acted in self-defense were at issue.  The court again recited the similarities it found between the two incidents, noting again based on *New*, the fact they were married "is a very important factor."  The trial court then stated:  "The Court is satisfied that, by a preponderance of the evidence, the prior uncharged act is true.  I'm not making any indication as to whether or not it's been proven by beyond a reasonable doubt or whether it's been proven by clear and convincing evidence.  That's not the standard.  The standard is preponderance of the evidence, *and I believe it's been met in view of the summaries that I've just given as well as the similarities* as well as the information provided by counsel."  (Italics added.)  We discuss the significance of the italicized portion of the court's ruling, *post*.

In considering the Evidence Code section 352 balancing analysis, the trial court did acknowledge that the asserted manner of killing in each of the two cases was dissimilar.  However, the court further stated that the underlying circumstances, if not the manner of death, were very similar, as were the motives.  Ultimately, the court concluded that the probative value of the evidence was not substantially outweighed by its prejudicial effect.  The court allowed the evidence to be admitted.

### 4.  Uncharged Misconduct Evidence Instructions & the Defense Mistrial Motions

At the conclusion of the prosecution's case-in-chief, upon the request of the defense, the trial court instructed the jury:  "The People have presented evidence regarding the death of [defendant's] former wife . . . in Georgia on September 26 of 1999.  This evidence was admitted for limited purposes.  You may consider this information only to determine whether or not at the time of [the victim's] death, in Count I, that

46

[defendant] had necessary intent. [¶] You may also use this information to determine whether . . . [d]efendant's alleged actions in Count I—regarding Count I were the result of a mistake, accident, or self-defense. You may consider that evidence only for these purposes and for no other."

Following the close of all evidence, the trial court instructed the jury with CALCRIM No. 375 as follows: "The People presented evidence that . . . [d]efendant committed an uncharged offense, to wit, murder, on September 26, 1999, and that offense was not charged in this case. [¶] You may consider that evidence only if the People have proved by a preponderance of the evidence that the [d]efendant, in fact, committed the uncharged offense. [¶] Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the [d]efendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] A, . . . [d]efendant acted with the intent to kill [the victim] in this case; [¶] Or B— and/or B, whether or not . . . [d]efendant's actions were the result of a mistake, accident, or self-defense. [¶] In evaluating this evidence, consider the similarity or lack of the similarity between the uncharged offense and the charged offense, and do not consider this evidence regarding September 26[], 1999, for any other purpose. [¶] Do not conclude from that evidence that . . . [d]efendant has a bad character or is disposed to commit crime. [¶] And if you conclude that . . . [d]efendant committed the uncharged offense, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that . . . [d]efendant is guilty of murder. The People must still prove the charge in this case beyond a reasonable doubt."

During the prosecution's initial closing argument, defendant moved for a mistrial, asserting that the prosecutor was impermissibly arguing propensity, and that the argument

47

was misconduct.  The trial court noted the argument "could have been cleaner," but denied the motion.[18]

During the prosecution's rebuttal argument, the defense again objected, but the objection was overruled without argument.[19]  After the jury began deliberating, the defense sought to make a record regarding the basis for its objection and moved once more for a mistrial.  The defense asserted the prosecution argued propensity and was using circular logic and improperly attempting to prove defendant killed his second wife based on the evidence in the instant case, and then prove defendant had the intent to kill the victim here with willfulness, premeditation, and deliberation, based on the prior death.  In the alternative to granting a mistrial, the defense argued the jury should be instructed the 1999 incident involving the second wife had to be proved on its own merits without consideration of the evidence related to the charged offense.  The prosecutor responded that her argument was not inappropriate and that it was the same concept she argued in her initial closing argument.  "It's the Doctrine of Chances.  The person that wins the lottery once – this is exactly what the basis of the cases are that allow this

---

[18]  The prosecutor argued the following to the jury:  "[B]esides the fact that the evidence has showed us what happened to [the victim] that night, we also know that the Defendant killed [her] because of what happened with [his second wife], and it's what's called the Doctrine of Chances.  [¶]  You know, there's a saying that if you win the lottery once, you're envied.  If you win the lottery twice, you're investigated.  And there's a reason for that.  [¶]  Look at – look at what's happened with the death of [his second wife].  The Defendant now has two dead wives, and in both cases look at these similarities:  He's the only witness.  Two cases, he's the only witness."  It was at this point that defendant objected on the grounds the prosecutor was arguing propensity and requested a mistrial.

[19]  The prosecutor told the jury:  "So either you believe his testimony – and to believe him, you must believe that he is the unluckiest guy in the world, because he had two wives die under suspiciously similar circumstances, going to his intent.  Both of his wives—"  It was at this point that the defense objected, but the objection was overruled.  The prosecutor went on to argue that both of defendant's wives "called him a pathological liar," but never said anything more about intent.

1101(b) evidence to come in.  The person who wins it once is envied.  The person that wins it twice is . . . investigated."  She further explained she was going to discuss intent when the objection was made.  The court acknowledged further instruction might be warranted, indicated it would look at the transcript of the prosecutor's rebuttal argument, and took the matter under submission overnight.

The following morning, after filing a written mistrial motion, the defense reiterated its arguments from the previous afternoon.  Thereafter, the trial court brought in the jury and reread CALCRIM No. 375 and then gave the following additional instruction:  "In determining whether the People have proven that the Defendant committed murder in Georgia on September 26, 1999, by a preponderance of the evidence, you must analyze the Georgia incident apart from all of the other evidence in this case.  [¶]  In other words, you may not consider in any way any evidence that pertains to the charged February 2012 incident in determining whether or not the Defendant committed murder on September 26, 1999, in Georgia."[20]

### C.  Admissibility of Uncharged Misconduct Evidence

"Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion."  (*Ewoldt, supra*, 7 Cal.4th at p. 393.)  " 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.'  [Citations.]  ' "The natural and inevitable tendency" ' is to give excessive weight

---

[20] On the previous day, the defense also argued that the prosecution's use of a PowerPoint slide which stated " 'Defendant is the unluckiest man in the world and has two wives die' " was the equivalent of arguing propensity and was misconduct.  The trial court indicated it was concerned about that argument, but concluded the new instruction would cure it.  On appeal, defendant does not raise the propriety of any of the prosecutor's arguments to the jury.

to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge." (*Hendrix, supra*, 214 Cal.App.4th at p. 238, quoting *People v. Guerrero* (1976) 16 Cal.3d 719, 724 (*Guerrero*).)

"Evidence of other crimes is admissible, however, when relevant for a noncharacter purpose—that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident.' [Citations.] [¶] Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern. Evidence may be excluded under section 352 if its probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Hendrix, supra,* 214 Cal.App.4th at p. 238.) Thus, as noted *ante*, the admissibility of uncharged crimes evidence depends upon consideration of three factors: (1) materiality of the facts to be proved; (2) probative value, or the tendency of the uncharged crimes to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence such as prejudicial effect or other section 352 concerns. (*Ibid*.) "Courts subject other crimes evidence to ' "extremely careful analysis." ' " (*Ibid*., quoting, *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

"[O]ther crimes evidence need be proven only by a preponderance of the evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1245, fn. 2 (*Steele*).) And as defendant acknowledges, his plea of not guilty put all elements of the charged offense at issue. (*People v. Booker* (2011) 51 Cal.4th 141, 171.) "We review the trial court's evidentiary rulings for abuse of discretion." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

In performing its gatekeeping function[21] under Evidence Code section 403, subdivision (a),[22] the trial court must determine by a preponderance of the evidence the existence of the prior uncharged act and defendant's connection to it as preliminary factual issues before the prior misconduct can be deemed admissible. (*People v. Cottone* (2013) 57 Cal.4th 269, 286, fn.10 (*Cottone*) [distinguishing the preliminary fact determinations between other crimes evidence under Evid. Code, §§ 1101, subdivision (b) & 1108]; *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115 (*Garelick*) ["the truth of the prior uncharged act and defendant's connection to it are preliminary factual issues which must be decided before the prior misconduct can be deemed admissible" under section 1101(b)]; *People v. Simon* (1986) 184 Cal.App.3d 125, 131, 132, 135 (*Simon*) [same; evidence was admissible under section 1101(b) to prove intent, motive, and to negate self-defense].) "[I]f the prior and defendant's connection to it are not established by a preponderance of the evidence, the prior is irrelevant to prove the . . . section 1101(b) fact for which it is being offered." (*Garelick,* at p. 1115.) Thus, in the context of this case, the court had a duty to determine whether there was sufficient

---

[21] Another panel of this court described Evidence Code section 402 as a "gatekeeping procedure." (*People v. Galambos* (2002) 104 Cal.App.4th 1147, 1157.) And our high court has also used the term "gatekeeper" to describe the court's duty in determining the admissibility of expert testimony. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.) Thus, we shall use the same term to describe the trial court's preliminary fact-determination duty under Evidence Code section 403 relative to the admissibility of evidence under section 1101(b).

[22] Evidence Code section 403, subdivision (a) provides in pertinent part: "(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] (1) The relevance of the proffered evidence depends on the existence of the preliminary fact; . . . (4) The proffered evidence is . . . conduct of a particular person and the preliminary fact is whether that person . . . so conducted himself."

evidence to determine defendant committed a homicidal act when his second wife was killed.

In cases where the underlying act of the uncharged act event is a given, probative value strictly depends on the degree of similarity between the uncharged act and charged crime. "The least degree of similarity is needed when . . . the evidence is offered to prove intent." (*People v. Jones* (2011) 51 Cal.4th 346, 371; see *Ewoldt, supra*, 7 Cal.4th at p. 402.) "[T]o be admissible to prove intent, the uncharged misconduct must be *sufficiently similar to support the inference that the defendant* ' "*probably harbor[ed] the same intent in each instance*." [Citations.]' " (*Ewoldt*, at p. 402, italics added.) As our high court has explained, "the recurrence of a similar result tends to negate an innocent mental state and tends to establish the presence of the normal criminal intent." (*Jones*, at p. 371; see also *Ewoldt*, at p. 402.)

Still, the similarities between the two events must be substantial enough to have probative value. (*Guerrero, supra*, 16 Cal.3d at p. 728.) As defendant observes, " 'it would be possible to list any number of marks common to the charged and uncharged crimes each of which is so lacking in distinctiveness that its presence, whether or not in combination with other equally nondistinctive factors, is wholly lacking in significance. . . . The sum of zeroes is always zero.' " (*Id.* at pp. 728-729.) And as another panel of this court recently observed, the trial court " ' "must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; *it must examine the precise elements of similarity* between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong." [Citation.] *If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.*' " (*People v. Williams* (2018) 23 Cal.App.5th 396, 419-420 (*Williams*), italics added, quoting *People v. Thompson* (1980) 27 Cal.3d 330, 316 (*Thompson*); see also *People v. C. Thompson* (2016) 1 Cal.5th 1043, 1114 (*C. Thompson*)

["[b]ecause this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded' "]; *People v. Daniels* (1991) 52 Cal.3d 818, 856 (*Daniels*) [same]; *Hendrix, supra*, 214 Cal.App.4th at p. 245 [same]; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1373 (*Spector*) [same].)

### D.  Decisional Law Relied Upon by the Trial Court

The trial court relied upon a line of cases involving the admission of evidence of prior uncharged acts.  Unlike here, in each of these cases, there was no dispute that the defendant committed the act underlying the uncharged events.

In *People v. Griffin* (1967) 66 Cal.2d 459 (*Griffin*), the defendant was charged with the sexually motivated murder of a woman.  On appeal, the defendant contended that the trial court erred in admitting evidence of a subsequently alleged act of sexual misconduct involving another woman which took place in Mexico.  The defendant relied on the fact that he had been acquitted of that crime.  (*Id*. at p. 464.)  Our high court first stated that otherwise admissible evidence of another crime is not rendered inadmissible by the defendant's acquittal.  (*Ibid*.)  The court then reasoned:  "the evidence of the subsequent crime was admissible because the similarities between the crimes made evidence of the later crime relevant to prove that [the victim's] injuries were not accidental but inflicted by defendant and to prove that he intended to rape her.  The evidence tended to prove that in both instances defendant became acquainted with a man living with a common law wife, used that acquaintance to be invited to the man's home for the night or longer, and then attacked the woman in the man's absence.  Under these circumstances, the evidence of the other crime is relevant . . . .."[23]  (*Id*. at pp. 464-465.)

---

[23]  Our high court further concluded, however, that it was reversible error for the trial court to exclude evidence that the defendant was acquitted of that subsequent crime by a Mexican court.  (*Griffin*, *supra*, 66 Cal.2d at pp. 465-467.)

But in *Griffin* there was no dispute that there had been a sexual encounter between defendant and the woman. When the woman's husband arrived home, he found the woman in her slip and defendant in the process of pulling up his pants. (*Id*. at p. 463.) The Mexican judgment stated: the woman "complained that she had been forcibly raped; [the] defendant declared that she had offered to have intercourse for five dollars." (*Id*. at p. 466, fn. 3.) Thus, it was a given that there had been a sexual encounter between the two.

In *Steele, supra*, 27 Cal.4th 1230, the defendant was charged with the 1988 killing of a woman (the victim) and the trial court admitted evidence of the defendant's 1971 killing of another woman as relevant to the defendant's mental state when he killed the victim. (*Id*. at p. 1243.) There was no dispute the defendant committed the 1971 killing. Our high court summarized the relevant evidence as follows: "In 1971, [the] defendant stabbed to death [a woman], who had been babysitting his girlfriend's children. [Both] killings bore several similarities. Both victims suffered manual strangulation and received a cluster of about eight stab wounds in the chest or abdomen. The victims resembled each other somewhat. Moreover, in both cases, [*the*] *defendant admitted the killing* to the police shortly afterwards, but supplied an explanation. After the first killing, [the] defendant claimed he had taken some mescaline, drank some beer, and smoked marijuana. When he arrived home, the victim complained that he had been gone a long time. Then, [the] defendant told the police, 'It just hit me the wrong way. All these mescaline and everything was taking effect. And I hit her. The next thing that I really remember is when I stabbed her and all the blood and everything.' In this case, [the] defendant blamed the killing on drinking peppermint schnapps and hearing a helicopter." (*Id*. at p. 1244, italics added.) Our high court concluded that the two killings were sufficiently similar to make the 1971 killing relevant to the defendant's mental state in committing the 1988 killing, observing that the least degree of similarity is required to prove intent. (*Ibid*., citing *Ewoldt, supra*, 7 Cal.4th at p. 402.)

54

In its reasoning, the *Steele* court applied the doctrine of chances, which "is based on a *combination* of similar events," and "teaches that the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous. Specifically, the more often one kills, especially under similar circumstances, the more reasonable the inference the killing was intended and premeditated." (*Steele, supra*, 27 Cal.4th at p. 1244.) From this, the *Steele* court reasoned that the evidence pertaining to the 1971 killing bolstered all three categories of evidence generally considered in determining whether the evidence of premeditation and deliberation is sufficient.[24] (*Id*. at pp. 1244-1245.)

In *New, supra*, 163 Cal.App.4th 442, defendant moved for severance. At issue was whether two murders were properly joined and whether the evidence was cross-admissible.[25] The defendant was convicted of two counts of first degree murder, one count based on the shooting death of his first wife in 1973, and the other count for the shooting death of his third wife in 2004. (*Id*. at p. 446.) The defendant acknowledged the 1973 shooting, but claimed his rifle had discharged when he dropped it while cleaning it. (*Ibid*.) Law enforcement had initially concluded the shooting was accidental, but reopened the case after the shooting of the defendant's third wife. (*Ibid*.) His third wife was discovered shot to death in the couple's bed. (*Ibid*.) The defendant denied shooting her, claiming he had gone out and later returned home to find her dead. (*Ibid*.)

---

[24] Discussed in greater detail *post*, these three categories of evidence or guidelines that may be considered in determining whether the evidence is sufficient to support a finding of premeditation and deliberation are: (1) planning activity, (2) motive, and (3) the manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).)

[25] The trial court relied heavily on *New* and so do the People on appeal. As we discuss *post*, the analysis for severance is different from the analysis concerning the admissibility of uncharged acts of misconduct.

The trial court in *New* ruled the evidence was cross-admissible to "prove absence of mistake or accident with regard to the 1973 events" and further to prove intent and motive. (*New, supra*, 163 Cal.App.4th at pp. 466-467.) The defendant asserted that he was prejudiced by the trial court's denial of his motion to sever the two murder charges because the evidence was not cross-admissible. (*Id*. at p. 468.) Specifically, the defendant asserted that the earlier murder was not cross-admissible because evidence of the circumstances surrounding his first wife's death was not admissible to prove identity or common plan or design in connection with his third wife's death. (*Id*. at p. 469.)

However, on appeal, the court in *New* reasoned that evidence regarding the defendant's third wife's death was cross-admissible on the issue of intent and lack of accident or mistake with regard to the defendant's first wife's death. (*New, supra*, 163 Cal.App.4th at p. 469.) Noting that the least degree of similarity was required for intent, the *New* court stated: "The circumstances surrounding" the deaths of the defendant's first and third wives were similar. "Perhaps most significant is the fact that both victims were married to [the defendant] at the time they were killed. In addition, both [victims] were shot a single time, in the back of the head, from a relatively close distance. Both victims appeared to have been asleep at the time they were shot. At the time each of the victims was killed, [the defendant] was the beneficiary of the victim's life insurance policy. These facts are sufficient to support an inference that [the defendant] did not accidentally shoot [his first wife], but instead, that he shot her intending to kill her." (*Id*. at p. 470.)

The trial court here found *New* significant because it viewed *New* as an example of an uncharged prior act "deemed an accident initially" but later held to be admissible under section 1101(b). However, the issue in *New* was not admissibility under section 1101(b); the issue was severance. And although the defendant asserted the first shooting was accidental, there was no dispute that the defendant had caused the gun to discharge and kill his first wife.

In *Spector, supra*, 194 Cal.App.4th 1335, the defendant was charged with murder for the shooting death of a woman (the victim) with whom he was acquainted. The question at trial was whether the defendant committed implied malice murder by killing the victim in the course of assaulting her with a firearm or whether the victim shot herself, either committing suicide or killing herself accidently. (*Id*. at p. 1342.) The trial court allowed testimony from five different women acquaintances who were victims of armed assaults by the defendant over a 20-year period. (*Id*. at pp. 1342-1343, 1372.) The *Spector* court concluded that the other crimes evidence was properly admitted to prove the defendant's motive for committing the victim's murder, and to prove that the victim's fatal gunshot wound was not self-inflicted. (*Id*. at pp. 1342-1343.)

In discussing the materiality of this evidence to prove absence of accident, mistake, or suicide, the *Spector* court stated that the evidence "was relevant because it tended logically, naturally, and by reasonable inference to make it less likely [the victim] had shot herself either intentionally or accidentally, a fact the defense tried to prove. As a result, the other crimes evidence tended to establish both the corpus delicti of the charged offense, and that Spector was responsible for the actus reus, facts the prosecution needed to prove." (*Spector*, *supra*, 194 Cal.App.4th at p. 1374.)

The *Spector* court determined that the other crimes evidence "was logically relevant because of . . . the 'doctrine of chances.' " (*Spector*, *supra*, 194 Cal.App.4th at p. 1377.) It described the "doctrine of chances" as a "probability-based calculation that arises from a history of prior similar acts." (*Id*. at 1379.) Under the doctrine of chances, the trier of fact must decide "whether the uncharged incidents are so numerous that it is objectively improbable that so many accidents would befall the accused." (*Ibid*.) The doctrine of chances is a " ' " 'logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.' " ' " (*Id*. at p. 1380, quoting *People v. Carpenter* (1997) 15 Cal.4th 312, 379, abrogated on another ground in *Verdin v. Superior Court* (2008) 43

57

Cal.4th 1096,1106-1107.) Because of the similarities, the *Spector* court concluded that the separate incidents in which the defendant committed armed assaults against women acquaintances in specific circumstances tended to prove the improbability that the victim either committed suicide or accidentally killed herself. (*Spector*, at p. 1380.)

Regarding similarity, the *Spector* court noted the following: " 'The record reveals defining similarities between appellant's assault on [the victim] and his prior assaults . . . . In each of these prior incidents, (1) appellant was alone with a woman whom he had invited to his house or hotel, (2) appellant had a romantic or sexual interest in her, (3) appellant drank alcohol, (4) appellant exhibited romantic or sexual behavior with her, (5) she attempted to leave, (6) appellant lost control, (7) appellant threatened her and pointed his accessible gun at her, and (8) appellant blocked or locked the door to force her to stay against her will.' " (*Spector*, *supra*, 194 Cal.App.4th at p. 1383.) The *Spector* court also observed that, in each instance, the defendant was characterized as extremely angry or enraged, and he demonstrated a significant mood swing. (*Id*. at p. 1384.) The evidence regarding the charged crime showed: "[the victim] . . . agreed to go [to Spector's home] with [Spector]. . . . Spector drank a substantial amount of alcohol that night. There was evidence some intimate or sexual activity had taken place during the two hours [the victim] spent at Spector's house. When she was shot, [the victim] was sitting in a foyer near the rear door of Spector's house, just a few feet from where [Spector's chauffeur] was sitting in the Mercedes waiting to drive her home. [The victim's] purse was apparently slung over her shoulder in preparation for leaving." (*Ibid*.) Under the circumstances presented, the *Spector* court concluded that the trial court did not abuse its discretion in admitting the other crimes evidence to show motive for his conduct and lack of accident or suicide. (*Id*. at p. 1385.) The court also rejected the defendant's claim that the trial court erred in finding the other crimes evidence more probative than prejudicial. (*Id*. at pp. 1387-1390.)

58

In *People v. Rogers* (2013) 57 Cal.4th 296 (*Rogers*), the defendant asserted the trial court improperly admitted evidence of the murder of two women in other states as probative of the defendant's intent and common design or plan in murdering the victim of the charged murder. (*Id*. at p. 325.) In each of the uncharged out-of-state murders, the victims died from multiple stab wounds. (*Id*. at pp. 312-315.) Thus, there was no dispute that the uncharged crime victims died as the result of a homicidal act at the hands of another. The victim of the charged killing died from manual strangulation. (*Id*. at pp. 302, 309-310.) Notwithstanding the difference in the manner of killing, the prosecution asserted that there were numerous distinctive features between the charged murder and the two uncharged murders. (*Id*. at p. 327.) Our high court determined that the trial court acted within its discretion in determining that "the combination of distinctive marks and similarities in all three murders was sufficient to meet the standard for admissibility of the other crimes evidence" as to intent, premeditation and deliberation. (*Ibid*.) Our high court observed: "Defendant selected each of his victims in a similar manner, used a common ploy to lure them to a place where they would be alone before murdering them, then acted in similar fashion after each murder; cleaning up the murder scenes or otherwise attempting to conceal the victims' bodies to buy himself time to escape, taking personal property from each victim, and fleeing across state lines." (*Id*. at pp. 327-328.)

Rejecting the defendant's argument that the three killings were insufficiently similar to be probative because " 'there was nothing distinctive about the fact that he "talked, danced and drank" in bars with women his own age,' " our high court observed that the " 'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' " (*Rogers, supra*, 57 Cal.4th at p. 328.) The court continued: "Although several of the factors . . . , e.g., drinking, dancing, and socializing with persons close to one's age in bars, when viewed in isolation, may not appear particularly unusual or distinctive, it was the combination of *similar factors*

59

common to all three murders—defendant's socializing, drinking, or dancing with women in their 30's, unaccompanied by a male companion, in local bars; buying them rounds of drinks to gain their trust; convincing them to give him a ride, or to accompany him back to his home or lodging; killing them in a confined or secluded space ([one victim's] bedroom, defendant's Tampa motel room to which [the other victim] had given him a ride, and in the case of [the charged] murder, the cab of [the victim's] pickup under cover of darkness late at night); hiding the bodies (or in the case of [the victim of the charged murder], burning her body) so as to avoid detection and buy further time to escape; fleeing from each crime scene with the victim's property; crossing state lines, in each instance within two days, to further facilitate his escape; and the fact that all three murders were committed within the very short time span of approximately six weeks— that rendered evidence of the out-of-state murders admissible to show that [the charged] murder was both premeditated and deliberate and committed with express malice." (*Ibid*.) (Bold omitted.)

All of these cases have one key circumstance in common. Unlike here, there was no dispute about whether the defendant committed the act underlying the uncharged misconduct evidence. In *Griffin*, there was no dispute the defendant had a sexual encounter with the woman in Mexico. In *Steele, New*, and *Rogers*, there was no dispute that the victims died as the result of homicidal acts. And in *Spector*, the evidence clearly showed defendant had engaged in prior assaultive conduct. We shall discuss the import of this circumstance *post* in our discussion of probative value.

### E. Analysis

#### 1. Material Purpose

"In order to satisfy the requirement of materiality, the fact sought to be proved or disproved must be either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred. [Citation.] Elements of the offense and defenses are ultimate facts. [Citation.] The absence of mistake is an intermediate fact. [Citation.] By

pleading not guilty . . . defendant placed all elements of the crime in dispute." (*Hendrix*, *supra*, 214 Cal.App.4th at pp. 239-240.) Indeed, defendant's mental state (intent to unlawfully kill and premeditation and deliberation) and whether he acted in self-defense or imperfect self-defense were in active dispute here. (See *People v. Rios* (2000) 23 Cal.4th 450, 462 (*Rios*) [where the issue of imperfect self-defense is properly presented, the prosecution must prove beyond reasonable doubt that this circumstance was lacking to establish the element of malice]; *Simon*, *supra*, 184 Cal.App.3d at p. 129 [section 1101(b) has been interpreted to allow the admission of "other acts" evidence that tends to negate a defendant's claim of self-defense].)

Accordingly, the uncharged act evidence here was offered for a material purpose.

## 2. Relevance and Probative Value

Normally, our review on this prong of the analysis would focus exclusively on similarities, but we first address another issue that is pertinent to the tendency of the evidence to prove material facts typically not addressed in other cases involving admissibility under section 1101(b). As in the cases upon which the trial court relied, there is typically no dispute about the act underlying the uncharged crime. In this case, the actus reus of the prior incident was in dispute. Unlike the cases upon which the trial court relied, it was not clear that defendant committed an act that caused his second wife's death. In our view, the theory advanced in limine by the prosecution amounted to using the charged killing of the victim to prove criminal agency as to the second wife's death, so as to then establish mens rea and negate self-defense regarding the victim's killing. Uncharged act evidence cannot be used in this way.

In *People v. Albertson* (1944) 23 Cal.2d 550, our high court stated: "Circumstantial proof of a crime charged cannot be intermingled with circumstantial proof of suspicious prior occurrences in such manner that it reacts as a psychological factor with the result that the proof of the crime charged is used to bolster up the theory or foster suspicion in the mind that the defendant must have committed the prior act, and

61

the conclusion that he must have committed the prior act is then used in turn to strengthen the theory and induce the conclusion that he must also have committed the crime charged. This is but a vicious circle." (*Id*. at pp. 580-581.) Other California appellate courts have applied this principle from *Albertson*. (See *People v. Erving* (1998) 63 Cal.App.4th 652, 664; *People v. Long* (1970) 7 Cal.App.3d 586, 590.) Here, although there is direct evidence defendant committed the act causing the victim's death in the charged offense and that he intended to kill her, the evidence concerning whether he intended to *unlawfully* kill, premeditation, deliberation and negating self-defense is circumstantial. And the evidence related to the death of defendant's second wife could aptly be characterized as "circumstantial proof of suspicious prior occurrences . . . ." (*Albertson*, at pp. 580-581.) Thus, we conclude the "vicious circle" referred to in *Albertson* is present here. Indeed, when the defense pointed out *Long* in arguing for mistrial after the prosecution's rebuttal argument, the trial court gave a belated instruction telling the jurors they must not consider evidence of the charged crime in determining whether defendant murdered his second wife. The problem here is that the trial court did that very thing in ruling on the admissibility of the uncharged event.

As we have noted, as a preliminary fact, the trial court must determine by a preponderance of the evidence the existence of the prior uncharged act and defendant's connection to it. (*Cottone, supra,* 57 Cal.4th at p. 286, fn.10; *Garelick, supra,* 161 Cal.App.4th at p. 1115; *Simon, supra,* 184 Cal.App.3d at pp. 131, 132, 135.) And "if the prior and defendant's connection to it are not established by a preponderance of the evidence, the prior is irrelevant to prove the . . . section 1101(b) fact for which it is being offered." (*Garelick,* at p. 1115.) Courts have also noted that "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not *clear*, the evidence should be excluded." (*Thompson, supra*, 27 Cal.3d at p. 316, italics added; *Daniels, supra,* 52 Cal.3d at p. 856; *Williams*, *supra*, 23 Cal.App.5th at p. 420; *Hendrix*, *supra*, 214 Cal.App.4th at p. 245; *Spector, supra,* 194 Cal.App.4th at p. 1373.) This is so

"[b]ecause this type of evidence can be so damaging." (*C. Thompson, supra,* 1 Cal.5th at p. 1114.) Thus, other acts evidence under section 1101(b) " 'should be received with "extreme caution" and if its connection with the crime is not *clearly perceived*, the doubt should be resolved in favor of the accused.' " (*Guerrero, supra,* 16 Cal.3d at p. 724, italics added.) The connection between an uncharged act and the charged crime cannot be clear unless there is clarity that the defendant committed the asserted act underlying the uncharged crime.

Indeed, there was no evidence establishing that defendant committed a specific act that resulted in his second wife's death. During the in limine hearing, the prosecutor speculated that there may have been "800 ways" defendant could have caused the crash and engineered his second wife's death, but no proof was offered to establish any specific act. The proffered evidence argued by the prosecution to establish defendant's culpability was a series of suspicious circumstances. But the proffered evidence before the trial court also showed that the lead investigator, arson investigator and pathologist concluded the death was accidental.

Nevertheless, in ruling on the admissibility of the Georgia incident, the trial court stated: "The Court is satisfied that, by a preponderance of the evidence, the prior uncharged act is true. . . . The standard is preponderance of the evidence, and *I believe it's been met in view of the summaries that I've just given as well as the similarities* as well as the information provided by counsel." (Italics added.) The court did not outline the evidence establishing a homicidal act in the "information provided by counsel" or otherwise discuss the proffered evidence that satisfied it that defendant's commission of murder regarding his second wife could be established by a preponderance of the evidence. Our review of the record reveals that the "summaries" the trial court referred to did not involve evidence establishing the murder of the second wife, but rather was a reference to its summary of the similarities between the deaths of defendant's second and third wives. And in any event, the italicized portion of the trial court's ruling set forth

63

above makes clear it relied, at least in part, on the purported similarities to determine there was proof by a preponderance of the evidence that defendant murdered his second wife. By relying on these similarities, the trial court used evidence related to the charged offense to establish defendant's culpability for murder related to the uncharged act. Thus, in performing its gatekeeping duty to determine the truth of the uncharged act of misconduct, the trial court did exactly what it later appropriately admonished the jury it could not do.

Part of the trial court's error relates back to its misunderstanding of *New*, *supra*, 163 Cal.App.4th 442, upon which it heavily relied. Indeed, the trial court returned to *New* in discussing defendant's mistrial motion after the prosecutor's rebuttal argument. Again, the trial court focused on *New*'s analysis of similarities. In doing so, the court erroneously observed, "the issue in the *New* case was whether or not the defendant at the time of the charged offense possessed the intent to kill his victim." But that was only partially correct. The issue there was whether charges related to the deaths of both wives were properly joined. And in such a situation, evidence of the later wife's death could be used to establish that the death of the prior wife was intentional. The same does not hold true when the issue is the admissibility of uncharged acts to prove some material fact related to charged offenses. In other words, unlike where evidence may be considered "cross-admissible" for purposes of severance of joined charges, when the issue is strictly whether evidence of an uncharged offense is admissible under section 1101(b) to establish some material fact related to the charged offense, evidence of the charged offense cannot be used to establish the commission of an uncharged criminal act.

" 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion' "; thus, where the trial court failed to apply the applicable principles in ruling on the admissibility of evidence, we must consider that an abuse of discretion. (*Hendrix*, *supra*, 214 Cal.App.4th at p. 239.) Accordingly, we conclude that the trial court abused its

64

discretion in performing its gatekeeping function and making its preliminary fact determination that there was evidence establishing by a preponderance of the evidence defendant's culpability for his second wife's death. Thus, we conclude the trial court abused its discretion in determining the evidence of the second wife's death tended to prove material facts related to the charged offense.

We need not address whether the evidence concerning the Georgia incident independent of the evidence related to the charged offenses established defendant committed a homicidal act resulting in his second wife's death because, as we next discuss, the probative value of this evidence, if any, was substantially outweighed by concerns listed in section 352.

### 3. Section 352 Analysis

Even if we were to conclude that the evidence related to the second wife's death was relevant and had probative value, we would conclude that the trial court abused its discretion by refusing to exclude that evidence pursuant to section 352. Section 352, provides that a court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Defendant asserts that any probative value related to the evidence of his second wife's death was substantially outweighed by section 352 prejudice because: (1) the uncharged act, which occurred in 1999, was remote; (2) the uncharged act had little probative value to prove that which it was admitted to prove; (3) the uncharged act was inflammatory; (4) the jury may have wanted to punish defendant for his second wife's death; and (5) the evidence would have the tendency to lead the jury to believe that he was a criminal mastermind and must have killed the victim here with deliberation and premeditation, and thus was impermissible propensity evidence.

65

We conclude that, assuming the trial court did not err in determining there was sufficient proof of defendant's culpability as to his second wife's death to establish relevance, any probative value of that evidence was substantially outweighed by the probability that its admission would necessitate undue consumption of time and create a substantial danger of undue prejudice. (Evid. Code, § 352.)

### a. Probative Value – Proof of Culpability and Similarities

As a first step to weighing the section 352 concerns, courts must first consider the evidence's probative value. That consideration includes an evaluation of how strongly the evidence tends to prove the material fact at issue. Because substantial prejudicial effect is inherent in uncharged act evidence, such evidence is admissible over a section 352 objection only if it has "substantial probative value." (*Rogers*, *supra*, 57 Cal.4th at p. 331; *People v. Foster* (2010) 50 Cal.4th 1302, 1331; *Ewoldt*, *supra*, 7 Cal.4th at p. 404; *Thompson*, *supra*, 27 Cal.3d at p. 318.) Given the lack of proof as to the actus reus, i.e., the homicidal act defendant purportedly committed to cause the death of his second wife, and the dissimilarities between her death and the killing here, we conclude that any probative value the uncharged event had relative to establishing intent and negating mistake and self-defense was insubstantial.

Even though the lowest degree of similarity is required to show intent, the more substantive similarities there are from which one can infer that defendant probably harbored the same intent in each instance, the higher the probative value. The similarities the trial court found here do not provide substantial probative value. Those points of similarity are: (1) both decedents were married to defendant; (2) both victims suffered "violent deaths" and defendant was the only person present at the time each wife was killed; (3) despite the violent nature of both incidents, defendant sustained relatively minor injuries which were purportedly not consistent with what one would expect if the events occurred as defendant claimed; and (4) both times defendant was under financial stress and he stood to benefit financially as a result of the deaths. We acknowledge these

66

similarities, but in examining "the precise elements of similarity" (*Williams*, *supra*, 23 Cal.App.5th at pp. 419-420), we also note in our calculus of probative value that there are significant dissimilarities.

The trial court here relied heavily on the *New* court's statement about the significance of the fact the defendant therein was married to both victims.  So too do the People on appeal, referring to this as the most "glaring similarity."  But the *New* court's observation about marital status was made in the context of a motion to sever separate murder charges for the defendant's killing of two wives, not in analyzing probative value of evidence to balance against section 352 concerns.

Our high court has noted that there are differences in the analysis concerning severance of properly joined charges and the analysis applicable to the related but different situation posed by admission of facts underlying an uncharged offense.  (*People v. Soper* (2009) 45 Cal.4th 759, 772 (*Soper*).)  In the latter situation, the prosecution has the burden of establishing the admissibility of the evidence, including persuading the trial court that the potential prejudice is outweighed by the probative value of the evidence.  (*Ibid*.)  " 'Admission of the evidence involves, inter alia, the danger of confusing the issues, introducing collateral matters, or tempting the jury to condemn [the] defendant because he has escaped adequate punishment in the past.  [Citation.]  It is therefore appropriate, when the evidence is of an *uncharged* offense, to place on *the People* the burden of establishing that the evidence has *substantial probative value* that clearly outweighs its inherent prejudicial effect.' "  (*Id*. at pp. 772-773, second italics added.)  The burden is reversed when it comes to the question of severance.  (*Id*. at p. 773.)  Regarding severance, " '[t]he *prosecution* is *entitled to join offenses* under the circumstances specified in section 954.[26]  The burden is on the party seeking severance

<hr />

[26]  Section 954 provides in pertinent part:  "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of

to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.  [Citations.]  When the offenses are [properly] joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise.  The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment.  That the evidence would otherwise be inadmissible [under section 352] may be considered as a factor suggesting possible prejudice, but countervailing considerations [of efficiency and judicial economy] that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a . . . motion [to sever properly joined charges].  *The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice*.' "  (*Soper*, at p. 773.)

In addition to the different allocation of the burdens, the nature of the abuse of discretion standard is different.  (*Soper*, *supra*, 45 Cal.4th at p. 774.)  A defendant seeking to establish error for failure to sever "must make a ' "*clear showing of prejudice* to establish that the trial court *abused its discretion* . . . ." ' "  (*Ibid*.)  Thus, " 'in the context of properly joined offenses, "a party seeking severance must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial." ' "  (*Ibid*.)  Where the evidence underlying the charges "would be cross-admissible, that factor alone is normally sufficient to dispel" prejudice for purpose of severance of properly joined charges.  (*Id*. at pp. 774-775.)  For example, in *New*, the evidence related to the last wife's death could be considered to establish that the previous wife's death was intentional and not accidental.  (*New, supra*, 163 Cal.App.4th at pp. 469-470.)  However, as we have noted, in the context of the issue before us, the evidence here was not cross-admissible in the sense that evidence of the charged offense

---

the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

could be used to establish the commission of a culpable act related to the uncharged offense. Accordingly, while the *New* court's discussion of similarities has some bearing here, its reasoning, conclusion, and affirmance of the trial court's ruling in that case is not "apples to apples" analogous.

As for the similarities the trial court relied upon here, we begin with the fact that both women were married to defendant at the time of their deaths. As the People point out, the court in *New* observed: "The circumstances surrounding [the two] deaths were similar. Perhaps most significant is the fact that both victims were married to [the defendant] at the time they were killed." (*New, supra*, 163 Cal.App.4th at p. 469.) But the court immediately followed that statement with: "*In addition, both . . . were shot a single time, in the back of the head, from a relatively close distance. Both victims appeared to have been asleep at the time they were shot. At the time each of the victims was killed, New was the beneficiary of the victims' life insurance policy.* These facts are sufficient to support an inference that [the defendant] did not accidentally shoot [the first wife], but instead, that he shot her intending to kill her." (*Id*. at pp. 469-470, italics added.) Thus, as the italicized language makes clear, the *New* court's observation concerning marital status was not divorced from important aspects of the circumstances in which the two wives were killed and the motive for the killings. And while we find the fact defendant here was married to the two decedents is not insignificant, we conclude the way in which the victims were killed and the lack of proof related to that circumstance regarding defendant's second wife cannot be overlooked in deciding the probative value to be weighed in the balance. This is not to say that other act evidence has to involve the same manner of killing. *Rogers* is an example where that was not required. (*Rogers, supra*, 57 Cal.4th 296 [prior uncharged murders committed by stabbing, charged murder committed by strangulation].) Nevertheless, the manner of killing is a significant dissimilarity here and more to the point, it was questionable whether defendant even committed a homicidal act in relation to his second wife's death.

69

Next, the trial court noted that the defendant was the only person present when the two wives were killed. And, on appeal, the People argue: "there was no question that [defendant] was the only person present" at the time of the deaths. We disagree. Unlike the uncharged Georgia incident, the charged offense did not take place in a remote location where nobody else was around. The charged act took place in the family home in a residential neighborhood and the couple's children were in the home at the time. Thus, this is not a situation where defendant committed a homicidal act at a location of his choosing where there was no chance of his act being discovered by others.

The trial court relied on its characterization that both victims suffered "violent deaths" as a similarity, but this does not strike us as being of much probative value. First, most homicides are the result of violence, so the same could be said for nearly all killings. Second, there is no similarity between the violence of inflicting multiple stab wounds and injuries sustained in a vehicle crash. Indeed, unlike the *direct violence* inflicted in the killing in the charged offense, under the prosecution's speculative theory, the purported violence related to the second wife's death was only *indirectly inflicted* by defendant by somehow causing the crash.

The trial court also relied on the nature of defendant's injuries, but this circumstance does not help move the needle either. It appears that the determination that defendant's injuries were inconsistent with both the uncharged event and the charged event was nothing more than the opinion of the trial court at the time it made its ruling. Indeed, there was no specific evidentiary proffer or expert report submitted to the trial court before its ruling indicating that the injuries defendant had after the Georgia incident were inconsistent with his description of what had happened or opining as to what injuries one should expect following such an incident. Nor was there any such evidence provided to the trial court supporting its finding that the type of injuries observed on defendant after his arrest for the charged offense were inconsistent with the events as he described them. Rather, again, at the time of the ruling, the determination that

70

defendant's injuries in both instances were inconsistent with what would be expected under the attendant circumstances was merely the court's opinion.

The trial court found as a point of similarity that defendant was under financial stress at the time of both deaths and that he financially benefited from both deaths. However, the nature of the financial benefit and amount of the benefits are materially dissimilar. Unlike the death of the second wife which resulted in large insurance payments, there was no such benefit associated with the death of the victim here. As for child support, defendant would be legally obligated to support his children whether the victim was alive or dead. And since there was evidence that it was the victim's income that paid for the kids' food, clothing and childcare, killing her would mean defendant would have to fund these expenses from his income. That leaves the potential avoidance of support payments to the victim, but to achieve the benefit of avoiding spousal support, defendant would have to convince people that he killed the victim in self-defense; this case does not present a situation where a killer husband tries to make the deaths of both wives appear accidental to achieve a financial benefit. As for defendant being financially stressed, the insurance payoff would have alleviated this problem at the time his second wife died, but killing the victim here would not have made his bills go away. Similar to child support, killing the victim and losing her income would only exacerbate this problem.

More importantly here, when the in limine motions were argued, it was clear that the main motive in this case was the affair and fear of loss of custody of his children, not financial gain. (See *Williams*, *supra*, 23 Cal.App.5th at p. 410 [noting that the motive in the charged incident was "rage at the collapse of the marriage"].) Defendant only killed the victim here when it was clear she would not terminate the affair and resume her relationship with him. Importantly, no similar circumstance was established regarding the death of the second wife.

71

The prosecution argued in the trial court and the People argue on appeal that the doctrine of chances establishes probative value. But the doctrine of chances is not a separate doctrine to show intent; rather it explains why a defendant's intent can be inferred from other acts of misconduct and events involving similar circumstances. Indeed, the doctrine of chances is the theory upon which the requirement to show similarities to establish intent is based.

Our high court has written: "The reasoning underlying use of an actor's prior acts as circumstantial evidence of that actor's later intent is well explained by Wigmore. It is based on 'the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. [¶] . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time under given circumstances, with an innocent intent.' " (*People v. Robbins* (1988) 45 Cal.3d 867, 879-880.)

Imwinkelried, upon whom the *Robbins* court relied, has noted: "The doctrine teaches us that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind." (1 Imwinkelried,

Uncharged Misconduct Evidence (rev. ed. 2020), § 5:6, p. 6 (Imwinkelried).) However, sometimes a single uncharged act will suffice when the conduct underlying the uncharged and charged events is similar and complex. "If the crime requires several separate steps for completion, the defendant's performance of a similar, complex act has obvious probative value on the issue of intent." (*Id*. at § 5:7, p. 5)

However, application of the doctrine of chances requires clarity as to the culpable act underlying the uncharged events as well as similarity. When uncharged misconduct evidence is offered to prove mens rea in the charged offense, Imwinkelried has noted: "*It is a given that the defendant committed the uncharged acts*, and the question is whether those acts are so similar to the charged act that they increase the probability that the defendant committed the charged act with a mens rea." (Imwinkelried, *supra*, at § 5:8, p. 9, italics added.) Here, it was not "a given" that defendant committed the uncharged acts, there is no complex series of similar acts, and in fact, as we have noted, there are material dissimilarities in the asserted similar circumstances.

This case is nothing like *Steele*, *supra*, 27 Cal.4th 1230 and *Spector*, *supra*, 194 Cal.App.4th 1335, upon which the People rely in their doctrine of chances argument. We have previously discussed both cases, but briefly return to *Steele*, a case involving a single uncharged act event and the application of the doctrine of chances. The *Steele* court noted, "the doctrine of chances is based on a *combination* of similar events. . . . The fact that defendant killed twice under similar circumstances is logically probative of whether the second killing was premeditated even if no independent evidence existed that the first killing was itself premeditated. . . . The fact defendant had previously killed with a knife strengthens the inference that he considered the possibility of homicide from the outset when he entered the victim's house with a knife. The fact that defendant had previously killed a young woman supports his stated motive that he hated women. The fact that defendant killed twice in the same distinctive manner—a cluster of seven or eight stab wounds in the chest or abdomen combined with manual strangulation—

73

strengthens the inference that he had a calculated design to kill precisely that way." (*Steele*, at pp. 1244-1245.) There is no similar combination of complex circumstances here.

We conclude that given the problems of proof concerning the asserted homicidal act and the dissimilarities, the probative value of the evidence concerning the second wife's death was not substantial. We turn next to the pertinent section 352 counterweights.

### b. Undue Consumption of Time

The "probability" that the presentation of the subject evidence would necessitate undue consumption of time was high. (Evid. Code, § 352.) We review the trial court's ruling in this regard based on matters as they were before the trial court at the time of the motion, not at trial. (See *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [we normally review a trial court's evidentiary ruling based on the facts known to the trial court at the time of the ruling].)

In its pretrial motion to introduce this evidence, the prosecution represented that it's presentation would consume "no more than one day" of trial. The trial court correctly expressed skepticism, stating: "I'm not so sure I can see how you can possibly do it anywhere near that quickly." The prosecution even acknowledged that it would present the testimony of at least two "civilian witnesses," presumably W.D. and/or M.H. and/or the second wife's sister, "a couple of police officers," testimony concerning the autopsy, and testimony concerning financial matters. Defense counsel notified the court that defendant would testify to respond to these matters. Defense counsel asserted that, if this evidence were introduced, "[w]e're talking about two trials." In addition to evidence presentation, the closing argument on the uncharged event by both counsel and additional instructions were factors the trial court should have considered regarding the consumption of time. (See *People v. Harris* (1998) 60 Cal.App.4th 727, 739 [noting that the other act evidence "necessitated lengthy instructions and admonitions and occupied a

74

good portion of the closing arguments"].)  In short, it was clear at the time the trial court originally considered and ruled on this motion that the presentation of this evidence was going to consume a substantial amount of time.  Defense counsel was right in that the evidence essentially involved a second murder trial.  As it turned out, at trial, between the prosecution and the defense, no fewer than 13 witnesses testified, at least in part, about circumstances related to the second wife's death.  This testimony was presented over parts of eight different days.  The entire trial involved the presentation of witness testimony over the course of 12 days.

It was always clear that the presentation of the evidence and argument of the evidence related to the second wife's death would consume a significant portion of this trial.

### c.  Undue Prejudice

While the evidence concerning the death of the second wife was not necessarily more inflammatory than the evidence of the charged offense, it nevertheless presented a substantial danger of prejudice because it painted defendant as someone who repeatedly killed his spouses.  In the absence of sufficient evidence establishing a culpable homicidal act and points of similarity tending logically, naturally, and by reasonable inference to establish a culpable mental state in the charged offense or tending to negate self-defense or the existence of a mistaken need to act in self-defense, the evidence was not much more than speculative propensity evidence.

Moreover, as our high court has noted, "the prejudicial effect of [uncharged act] evidence is increased if the uncharged acts did not result in a criminal conviction.  This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047, citing *Ewoldt*, *supra*, 7 Cal.4th at p. 405.)  Unlike in

75

*Steele*, where the court concluded the fact the defendant was convicted of the prior killing reduced any prejudicial effect (*Steele*, *supra*, 27 Cal.4th at p. 1245), here there was no punishment and, to the contrary, there was a significant financial benefit defendant realized–over one million dollars in insurance payments.  Thus, the danger that some jurors might want to punish defendant for his second wife's death was high.

Moreover, at the time of the ruling, the evidence was potentially unduly prejudicial inasmuch as it gave rise to the likelihood of the jury employing circular reasoning in convicting him:  Defendant killed is third wife in the charged offense, therefore he likely killed his second wife during the 1999 Georgia incident, therefore in the charged offense, he acted with intent to unlawfully kill and premeditation and deliberation and not in self-defense or under the mistaken belief in the need to defend himself.  The trial court finally realized this potential prejudice and gave an instruction in an attempt to mitigate that prejudice.

### d.  Conclusion – Section 352

In light of the insubstantial probative value of this evidence, and the probability that its admission would necessitate undue consumption of time and create a substantial danger of undue prejudice, we conclude the trial court abused its discretion in denying defendant's objection on section 352 grounds.

### F.  Harmless Error

Notwithstanding our conclusion that the evidence related to the second wife's death should have been excluded, we conclude that the error was harmless.

### 1.  Standard of Review

Defendant asserts that we must assess the prejudice he sustained under the "harmless beyond a reasonable doubt" standard from *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*) because the error violated his constitutional right to due process and a fair trial by requiring him to defend against another homicide allegation which, in turn, deprived him of the opportunity to present a viable defense.  He

asserts that the introduction of this evidence was conducive to irreparable mistake, and therefore its admission violated his federal due process rights. "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error." (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

The People counter that the test set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) is applicable here. "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

We agree with the People that the *Watson* standard applies. "Erroneous admission of other crimes evidence is prejudicial if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached." (*People v. Felix* (1993) 14 Cal.App.4th 997, 1007-1008; see also *People v. Welch* (1999) 20 Cal.4th 701, 749-750 [whether introduction of other crimes evidence violated section 1101, it was not prejudicial based on the *Watson* standard]; *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 755 [it is well-settled that claims of error in the admission of prior crimes evidence are evaluated under the *Watson* standard]; *People v. Lopez* (2011) 198

77

Cal.App.4th 698, 716 [applying the *Watson* standard to determine whether the erroneous admission of other crimes evidence was harmless]; *People v. Perkins* (1984) 159 Cal.App.3d 646, 652 [applying the *Watson* standard to assess prejudice resulting from the erroneous admission of evidence of uncharged offense].) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (*Ibid*.) While we conclude it was error to admit this evidence, we further conclude that it did not render defendant's trial fundamentally unfair, and therefore we apply the *Watson* test in evaluating prejudice.

## 2. Analysis

It was undisputed that defendant killed the victim. Defendant acknowledged he pushed the scissors into the victim's neck and that he wanted her to die when he did so. Thus, by his own admission, defendant acted willfully in that he intended to kill the victim. (See CALCRIM No. 521.)

" ' " ' "[P]remeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).) " ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 824 (*Casares*), disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Courts look to evidence of planning, motive, and manner of killing as guidelines to assess the sufficiency of evidence establishing deliberation and premeditation (see generally *Morales,* at pp. 88-89; *Anderson, supra*, 70 Cal.2d at pp. 26-27), and we find it useful to consider those guidelines here in our harmless error review.

78

We begin with motive. The evidence establishes that the victim was involved in an extra-marital romantic relationship. She planned to divorce defendant and marry J.W. Defendant was aware of the victim's relationship with J.W., and of how long it had been going on. Shortly before the victim's death, defendant called her father, which was unusual. Defendant asked, " 'Daddy, what am I going to do? … the marriage is in trouble. What can I do? I'm desperate. I want to save my family.' "

The day before defendant killed the victim, she worked on divorce forms. She planned to fax the divorce papers to her attorney the following day. The evidence of the ongoing affair and impending divorce provided a strong motive for killing the victim.

We next consider planning. In the weeks leading to the victim's death, defendant was busy painting a picture of the victim as psychologically unstable, paralyzed with depression, and in need of psychiatric care. Defendant told the victim's father that she was psychologically unstable, that she was smoking, drinking, and losing weight. He said she was "losing her mind."

Approximately two weeks before the victim's death, according to E.D., defendant's supervisor, defendant expressed concern for the victim. Defendant told E.D. that she was paralyzed with depression, and that he was trying to arrange for psychiatric care. Defendant also told E.D. that the victim had been drinking and was suffering from alcoholism. Defendant claimed he was concerned about her ability to care for the children. He stated that he might need to take time off from work. On February 10, 2012, E.D. sent a text message to defendant stating that he hoped all was well "on the family front." Defendant responded, " 'trying to get [the victim] stabilized. Hard. Outcome unknown.' "

After he killed the victim, defendant told the detectives he should not have confronted her because she had been "spinning a little more and more out-of-control." He described her as a "powder keg."

79

Defendant's characterization of the victim was starkly at odds with the other descriptions of her in the time period before she was killed. Her father saw no indication that the victim was binge drinking or having psychological problems. J.W. testified that the victim drank only moderately and that, between 2009 and her death, her drinking habits did not change. J.W. did not detect alcohol on the victim's breath which would make him think she was sneaking alcohol. J.W. testified that, during this time, the victim was indeed losing weight and losing hair from stress. However, she did not talk about suicide or depression or anxiety or anything that caused J.W. to be concerned about her mental health. They were planning a future together.

This fabricated evidence concerning the victim's emotional state supports the conclusion that defendant was planning her death, laying the groundwork for some claim related to her purportedly deteriorating mental state.

Additionally, law enforcement never located the missing Toshiba computer on which the support calculations had been made or the missing hard drive from the home computer. A reasonable inference can be drawn based on the missing computer that defendant was aware of that the victim had filled out the Judicial Council forms. Under the circumstances, it could be reasonably inferred that defendant removed the computer and hard drive to cover up his motive and as part of a plan to kill the victim.

The manner in which defendant killed the victim supports the jury's determination that he acted deliberately and with premeditation. According to defendant's own account, he ran out of the room to the garage after an initial altercation. He then decided to go back. Before doing so, he put on a padded motorcycle jacket. He barged into the victim's bedroom. According to defendant, when the victim kicked him, he became enraged and "went after her." He "bear crawled up her," and tried to choke her. Defendant eventually gained control over the scissors and struck her on the face and throat. He "went for her throat."

At this point, in defendant's own narrative to the detectives, the victim began to beg for her life, and kept telling defendant that they could "resolve this." She insisted they could work it out and that they would not get a divorce, and she begged defendant to "give [her] another chance." She pleaded with him, "[d]on't do this." It can be reasonably inferred from these circumstances and the motive that instead of stopping, defendant *made a calculated decision* to "push[] the scissors [into his wife's throat] as far as [he] could." According to defendant's statement to the detectives, he "[j]ust tried to drive it deeper and deeper." Defendant expressly acknowledged that at that point, he wanted the victim to die. He told the detectives, "I just . . . went for the throat and then eventually her body went limp." During his testimony, defendant confirmed that the victim had begged for her life, and that he wanted her to die.

Dr. Fiore testified that the victim's death would not have been instantaneous. Rather, it would have taken several minutes, perhaps as long as ten minutes, before she lost enough blood to lose consciousness. Defendant told the detectives that, after the victim went limp, he lay on top of her "for a long time," perhaps five or ten minutes, which roughly corresponds with how long it would have taken the victim to lose enough blood to lose consciousness.

After neutralizing the purported threat, defendant did not summon medical aid or call law enforcement, and according to his own account, did not himself attempt to resuscitate his wife for approximately 30 minutes. Defendant then cleaned the scene, but thinking "what do I do with all these cleaning supplies, this looks horrible," he threw the cleaning supplies into the fire in the fireplace. By the time defendant caused law enforcement to be summoned, the victim had been dead for hours.

That defendant intended to kill and thought about killing before he did so is not in serious dispute. The question was whether the killing was lawful because he acted in self-defense or voluntary manslaughter because he killed in imperfect self-defense. The prosecution had to prove beyond a reasonable doubt the absence of self-defense and

81

imperfect self-defense. (*People v. Banks* (1976) 67 Cal.App.3d 379, 384; *Rios*, *supra*, 23 Cal.4th at p. 462.)

At the time of the killing, the victim weighed 110 pounds. Defendant weighed 230 pounds, outweighing her by 120 pounds. According to defendant's account to the detectives, after he initially went into the victim's separate bedroom, he was the one who started the physical confrontation by punching her. Thus, even according to his own story, defendant was the initial aggressor.

Also pertinent to who was the initial aggressor, there was substantial evidence indicating that the victim feared defendant for which there was no objection and is not challenged on appeal. Three days to a week before the victim was killed, she told E.D. that she was seeking a restraining order in connection with her divorce because defendant threatened, " '[i]f you divorce me, you'll wind up like my second wife.' " From this evidence, it can be inferred that the victim was not the aggressor in the incident that led to her death.[27] (See *People v. Spencer* (1969) 71 Cal.2d 933, 945-946 (*Spencer*) [victim's statements of fear are admissible to prove the victim was not the aggressor when defendant claims self-defense]; *People v. Romero* (2007) 149 Cal.App.4th 29, 37 (*Romero*) [same].)

The evidence concerning the victim's wounds undermined defendant's claim of self-defense. The wounds reflected a much more vicious attack than defendant described to the detectives, and also demonstrate the deliberate nature of his attack. The victim

---

[27] There was additional evidence of statements the victim made which defendant did not object to and does not challenge on appeal. These were the statements defendant made concerning his second wife's ashes, but given the inconsistencies, this evidence was less compelling. The victim either told various people several versions or the witnesses misrecollected what she told them. As noted, when the victim inquired about winding up like the second wife – ashes in a box – the victim told people defendant responded: " 'not if you watch yourself' "; " 'if you don't get out of line, then you won't' "; " 'you're not going to get in my way, are you?' "; and " 'not if you don't make me angry.' "

sustained a severe incised wound leading from the edge of her eyelashes down her cheek, exposing her cheekbone. Another incised wound extended from her eyelashes towards her ear. It is reasonable to infer that once those wounds were inflicted, they would have significantly impeded any attempt by the victim to attack defendant. Additionally, the victim sustained several linear track-like wounds crossing the front of her neck from one side to the other which were consistent with something long being repeatedly drawn across the skin of her neck. It would be reasonable to infer that defendant deliberately inflicted these wounds in an unsuccessful attempt to slash the victim's throat before resorting to stabbing her through her jugular vein. As for the fatal wound, it was an inch-and-a-half deep stab wound to the right side of her neck extending into her jugular vein created by an object such as scissors "being driven into the neck."

And the victim's defensive wounds, including the stab wounds to the palms and the severed tendons to her right hand making her two fingers immobile undermine defendant's claim that he and she struggled over control of the scissors which he claimed were in her right hand just before he wrestled them away and inflicted the fatal wound. The incised wounds to the face, the stab wound to the lip, the stab wound to the back above the buttocks, and the multiple marks behind her ear and on her neck and collar bone area possibly caused by the closed tip of scissors further show that defendant had full control over the scissors as he deliberately poked, stabbed and slashed the victim.

Also undermining defendant's version of the events and his claim of self-defense, is the testimony of the neighbors to whom defendant brought the children later that morning. V.J. testified defendant looked like he had "taken a shower" and "smelled like shampoo or cologne." She also testified that defendant did not have any injuries on his hands or face. She specifically testified when defendant handed her his baby, she saw his hands, and there were no injuries on his hands. B.J. also testified he did not observe any injuries to defendant's hands or face. However, when police arrived later, defendant had "obvious" bandages on his hands. Dr. Fiore examined photographs of these injuries and

opined that one of them looked "more kind of cut out" than a defensive wound. A jury could reasonably infer that some or all of defendant's injuries were self-inflicted in a belated effort to contrive evidence to support his self-defense claim.

As the jury was instructed, a determination that a defendant committed a justifiable homicide based on self-defense required a finding that the defendant used no more force than reasonably necessary to defend himself against the imminent danger of being killed or suffering great bodily injury. (CALCRIM No. 505.) But, according to his account of the events, defendant fled the physical altercation with the victim and went to the garage. At that time, he could have chosen to leave, or to call 911, which he did not do. Instead, he went back into the bedroom. Further, as noted, when he reported the victim's death to D.B., he acknowledged: "I didn't have to take it that far." While at trial defendant testified that, when he said this, he meant that he "should have had the strength to disable her and get the child and get out of the room without having it erode or degrade into a life-or-death situation," the jury was free to reject this belated explanation and conclude instead that defendant's earlier statement acknowledged that the force he used was excessive. And again, based on his own account of the struggle, the victim pleaded for her life before he thrust the scissors into her neck severing her jugular vein.

Moreover, the only evidence directly supporting defendant's claim of self-defense was his own statements to law enforcement and his testimony. Defendant testified that a litany of the prosecution witnesses had lied or been less than truthful, and that the victim had lied. Unlike all the other witnesses, he maintained he told the truth about everything. However, the jury also heard evidence, and defendant's admissions, that he had lied to employers on two occasions by telling them that he had cancer when he did not. And, as noted, the evidence established that defendant fabricated evidence concerning the victim's mental state prior to the killing. A rational trier of fact may disbelieve those portions of a defendant's statements that are obviously self-serving, reject implausible explanations, and draw inculpatory inferences from his testimony and the other evidence.

84

(*People v. Silva* (2001) 25 Cal.4th 345, 369.)  It would have been reasonable for the jury to conclude defendant lacked credibility or otherwise reject his account of the events and his claim of self-defense.

That defendant chose to return to the bedroom after escaping to the garage also undermines a finding that defendant killed in the heat of passion.  Even assuming the victim's purported threat to have J.W. take care of defendant was both believable and sufficient provocation, defendant had an opportunity to cool off when he went to the garage.  As the jury was instructed, "[i]f enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." (CALCRIM No. 570.)  In defendant's own description of the initial confrontation, he gained the upper hand and fled from the bedroom to the garage, where he had the choice to leave, to call 911, to call friends for assistance, or to take some course of action other than donning a padded motorcycle jacket as armor and returning as he described. Defendant's flight to the garage after gaining the upper hand on the victim "represented a distinct and divisible event in the sequence of events and provided him sufficient time to 'cool down.' " (*People v. Middleton* (1997) 52 Cal.App.4th 19, 34, disapproved on another ground in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752, fn. 3.)

Finally, defendant attempted to mount a mens rea defense through the expert testimony of Dr. Lossy, summarized *ante*.  However, nothing Dr. Lossy said in his testimony undermines our conclusion about the strength of the evidence establishing that defendant committed willful, premeditated and deliberate murder.

As we noted *ante*, in our harmless error analysis under *Watson*, we "may consider, . . . whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran,* 56 Cal.4th at p. 956.)  And we focus "not on what a reasonable jury *could* do,

85

but what such a jury is *likely* to have done in the absence of the error under consideration." (*Ibid.*)

### 3. Conclusion – Harmless Error

Independent of the evidence concerning the second wife's death, the evidence outlined above established that defendant intentionally killed the victim, and that he did so willfully and with deliberation and premeditation. Indeed, the evidence overwhelmingly supports this conclusion. [28] In light of the other evidence before the jury, it is not reasonably probable that, had the uncharged act evidence not been admitted, a result more favorable to defendant, such as a conviction of second degree murder, voluntary manslaughter based on heat of passion or imperfect self-defense, acquittal upon a finding of lawful self-defense, or even a hung jury would have been achieved. (See generally *Watson, supra*, 46 Cal.2d at pp. 836-837.)

## II. The Victim's Statements and Evidence Relating to Fear of Defendant

### A. Additional Background

In his motions in limine, defendant sought to exclude: (1) the victim's statements about defendant beating an unidentified person in Bali approximately 10 years prior to the date of trial; (2) the testimony of the victim's brother describing the incident when defendant allegedly choked the victim in front of others as a sort of demonstration; and (3) the victim's statements about a plan by defendant to stage an automobile accident in order to collect money from his employer. Defendant requested the exclusion of this evidence on relevance, hearsay, and section 352 grounds.

---

[28] In our evaluation of harmless error here, we have not considered the evidence related to the victim's state of mind that defendant argues on appeal was erroneously admitted. We discuss that evidence in an unpublished portion of this opinion in part II. of the Discussion, *post*.

In opposition, the prosecution asserted that the victim's state of mind was relevant and fell within an exception to the hearsay rule. Relying on Evidence Code section 1250, the prosecutor asserted that the evidence of the victim's then-existing state of mind was not inadmissible by operation of the hearsay rule when offered to prove her state of mind at that time when it is an issue in the action. And the evidence was relevant to the victim's state of mind and fear of defendant at the time of the killing to show that she was not the initial aggressor and thus to negate defendant's claim of self-defense.

The court denied defendant's motion and allowed the jury to hear the evidence based on the prosecution's state of mind theory.

At the close of the prosecution's case, the trial court instructed the jury "concern[ing] statements made by [the victim] before her death." The trial court instructed the jury: "The People have also presented evidence that [the victim] made a number of statements prior to her death on February 27, 2012. If you believe that one or more of these statements were made by [the victim], you may consider that information only for the limited purpose of determining her state of mind at the time of her death. That evidence may not be considered for any other purpose." The trial court re-read this instruction to the jury following the close of all evidence.

## B. Defendant's Contentions

Defendant asserts that the trial court erred in admitting evidence relevant to the victim's state of mind, specifically her fear of defendant, on the ground that it was irrelevant, improper character evidence, and was otherwise inadmissible on section 352 grounds. Defendant raises this contention in connection with numerous accounts about which witnesses testified, beyond the three instances that were the subject of defendant's in limine motion. In addition to those three instances, defendant raises this claim in connection with testimony describing: (1) the scuba diving incident in which defendant, who had the only source of light, abandoned the victim; (2) defendant chasing a contractor down the street with a baseball bat and throwing rocks at people; (3) the

87

victim's statement to J.W. to look carefully at defendant if she ended up dead; (4) the victim's claim that defendant raped her, resulting in an unwanted pregnancy; (5) the victim's description of defendant as emotionally abusive, and her statement, in response to being asked about whether defendant was physically abusive, that she did not bruise easily; and (6) the fact that defendant was hiding money which made her fear for her life. Defendant asserts that the admission of this evidence infringed on his federal constitutional due process rights. He also asserts that, to the extent he forfeited any contentions relating to this evidence, he was denied the constitutionally effective assistance of counsel.

## C. Forfeiture

Regarding the testimony which was not the subject of the in limine motion, defendant did not object on the grounds asserted in this appeal when the testimony was introduced.[29] Thus, defendant forfeited his contentions by failing to object to the admission of the evidence in the trial court on the grounds he asserts on appeal. (*People v. Pearson* (2013) 56 Cal.4th 393, 438 (*Pearson*) [defense counsel's hearsay objection in the trial court failed to preserve claim based on relevance, which claim was therefore forfeited on appeal]; *People v. Alexander* (2010) 49 Cal.4th 846, 912 [because defendant did not object to evidence at trial as improper character evidence under Evid. Code, § 1101, he forfeited such a claim]; *People v. Gurule* (2002) 28 Cal.4th 557, 626 [failure to raise objection based on Evid. Code, § 352 before the trial court forfeits contention on appeal]; see also Evid. Code, § 353.) Because defendant has also raised the contention that his trial counsel was constitutionally ineffective for failing to object to the

---

[29] As for E.D.'s testimony that the victim told him defendant was keeping money somewhere, she did not know why, and that this frightened her, the defense did object, but on grounds of speculation. The objection was overruled. Defendant does not renew that contention here.

introduction of this evidence, we shall address defendant's contentions *post,* following our discussion of his preserved contentions.

### D.  State of Mind Evidence and Standard of Review

"In pertinent part, Evidence Code section 1250 creates an exception to the hearsay rule that permits admission of 'evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) . . . when:  [¶]  (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or any other time when it is itself an issue in the action; or  [¶]  (2) The evidence is offered to prove or explain acts or conduct of the declarant.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 819 (*Jablonski*), quoting Evid. Code, § 1250, subd. (a).)[30]  As our high court has made clear, " ' "a victim's out-of-court statements of fear of an accused are admissible under [Evidence Code] section 1250 only when the victim's conduct in conformity with that fear is in dispute.  Absent such dispute, the statements are irrelevant." ' " (*Jablonski,* at p. 819.)

In addition to statements admissible under Evidence Code section 1250, statements that convey circumstantial evidence supporting the premise that the victim feared defendant could be admissible as nonhearsay statements not offered to prove the truth of the matter asserted.  Our high court explained the difference between statements providing direct evidence of a victim's fear admissible under the Evidence Code section 1250 hearsay exception and nonhearsay statements providing circumstantial evidence of

---

[30]  Evidence Code section 1250 is subject to the limitation set forth in Evidence Code section 1252.  That section provides:  "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."  Defendant does not raise Evidence Code 1252 or assert that any of the statements at issue were made under circumstances indicating their lack of trustworthiness.

the victim's fear. "In the hearsay category of statements were [the victim's] direct declarations of her state of mind—e.g., 'I am afraid of [defendant].' Although these statements were hearsay, they were admissible under the hearsay exception of Evidence Code section 1250 to prove the truth of the matters asserted." (*People v. Riccardi* (2012) 54 Cal.4th 758, 822 (*Riccardi*), disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 (*Rangel*).) "In the nonhearsay category of statements were [the victim's] indirect declarations of her state of mind, because they contained descriptions or assessments of defendant's conduct that engendered [the victim's] fear or altered her conduct—e.g., '[Defendant] kidnapped me at gunpoint.' These statements were not hearsay to the extent they were admitted to prove circumstantially [the victim's] state of mind or conduct, and not to prove the truth of matters asserted regarding defendant's conduct." (*Riccardi*, at p. 823.)

We review the trial court's admission of this evidence over objections based on relevance or section 352 for an abuse of discretion. (*Riccardi, supra*, 54 Cal.4th at pp. 809, 815.)

### E. Analysis of Preserved Contentions

In light of defendant's reliance on self-defense, the victim's state of mind was at issue. Thus, her statements about threats defendant made and statements she made about defendant's conduct from which one could infer her fear of him were relevant and admissible under Evidence Code section 1250 or as circumstantial evidence of her fear. (See *Riccardi, supra*, 54 Cal.4th at p. 822; *Spencer, supra*, 71 Cal.2d at pp. 945-946; *Romero, supra*, 149 Cal.App.4th at p. 37.) Having raised the issue of self-defense, which would require the trier of fact to determine that the victim was the aggressor, the prosecution was entitled to demonstrate she was apprehensive and unlikely to be aggressive. " 'Her fear would then have been a factor properly before the factfinder in its deliberations on the defendant's claim of self-defense.' " (*Spencer*, at p. 946.)

90

### 1.  Beating in Bali

The victim told Je.W. and her other girlfriends that, on an occasion when she was on vacation, a person had hit on her, and defendant "beat that person to a bloody pulp and left them there, and she wasn't sure if they were alive or dead."  Similarly, the victim told J.W. that during her honeymoon in Bali, defendant assaulted a tour guide who had "goosed" her.  She said defendant beat the man and may have killed him.

The event recounted demonstrates that the victim observed an episode of defendant's explosive violence firsthand.  We conclude that this testimony was relevant to the victim's state of mind, specifically her fear of defendant, and this testimony was thus relevant and admissible for the proper inference that the victim was not the aggressor in the confrontation with defendant that led to her death.

This evidence was not hearsay admitted for its truth – that defendant beat a man while on his honeymoon.  Rather, it was offered for the nonhearsay purpose of serving as circumstantial evidence of the victim's state of mind – that she was in fear of defendant.  (See *Riccardi, supra*, 54 Cal.4th at p. 823.)  Thus, we conclude that the trial court did not abuse its discretion in admitting this nonhearsay evidence as relevant to the victim's state of mind, which was at issue.

Contrary to the cases on which defendant relies (*People v. Hernandez* (2003) 30 Cal.4th 835, 872; *Jablonski, supra*, 37 Cal.4th at pp. 818-821), where the victim's state of mind was not in issue, here, because self-defense was asserted and the victim's fear of defendant was at issue, this evidence was admissible.  (See *Spencer, supra*, 71 Cal.2d at pp. 945-946; *Romero, supra*, 149 Cal.App.4th at p. 37.)[31]

_____

[31]  Citing *Jablonski*, defendant also suggests that such evidence is only admissible if the victim's statements were communicated to the defendant.  But in *Jablonski*, the court expressly concluded the victim's state of mind was not in issue and thus the evidence was inadmissible for that purpose.  (*Jablonski, supra*, 37 Cal.4th at p. 820.)  The court then went on to conclude that because the victim's statement of fear had been communicated

Defendant attacks the probative value of this evidence based on remoteness. However, it does not matter that this attack occurred 10 years prior to the killing and that the victim continued to live with defendant in the interim. Neither the passage of time nor the fact that she did not immediately abandon defendant undermine the conclusion that the victim had witnessed defendant's violence and, as a result, knew what he was capable of when provoked.

We further conclude that the trial court did not abuse its discretion in admitting this evidence over defendant's section 352 objection. This testimony was probative, as stated, and gave rise to no probability that its admission would necessitate undue consumption of time, confuse the issues, or mislead the jury. (See Evid. Code, § 352.) While this evidence could arguably create some danger of undue prejudice as tending to depict defendant as a violent person, given his self-defense claim, we conclude this potential danger did not substantially outweigh its probative value. And this evidence was far less inflammatory than the properly admitted evidence, in the form of defendant's own statements regarding how he killed his wife.

Additionally, the trial court instructed the jury that evidence of the victim's statements was admissible for the limited purpose of assessing her state of mind, and that it was not to be considered for any other purpose.

Thus, we conclude that the trial court properly denied defendant's in limine motion as to this testimony.

---

to defendant, it was admissible to establish defendant's state of mind in that he knew his encounter with the victim at her residence was " 'not going for a friendly visit,' " and thus established that defendant planned to approach the victim by stealth as opposed to open confrontation, which, in turn, established premeditation and deliberation. (*Id*. at p. 821.) Thus, the evidence was admitted not to show the victim was afraid of defendant but rather for the effect on defendant's state of mind. (*Id*. at pp. 820-821.) That is not the case here.

## 2. Strangulation Demonstration

The victim's brother testified that defendant described a time when he got what he felt was a bad deal on an airplane which put his life in danger. Defendant demonstrated what he wanted to do to the person involved in that transaction by grabbing the victim around her neck and shaking her violently. After defendant released her, he was apparently unaware he had hurt her. When he left to go to the bathroom, the victim cried.

For the same reasons the testimony concerning defendant's beating of a stranger in Bali was properly admitted, we conclude that the evidence pertaining to this strangulation demonstration was also relevant and admissible to circumstantially establish the victim's fear of defendant, and show she was unlikely the aggressor in the incident where defendant took her life.

We further note that defendant's conduct as described by the victim's brother was an act of domestic violence. Defendant was not entitled to have the jury determine his guilt or innocence on a false presentation that his relationship with the victim was peaceful. (*People v. McCray* (1997) 58 Cal.App.4th 159, 172; *People v. Zack* (1986) 184 Cal.App.3d 409, 415.) Indeed, this act of domestic violence was relevant and probative on the issue of defendant's intent as well as the victim's state of mind. (*McCray*, at p. 174.) And the probative value of this evidence was enhanced when considered in combination with the autopsy evidence and defendant's own statements indicating that defendant choked the victim before he killed her.

Moreover, the probative value of this evidence is not substantially outweighed by any section 352 concern. The admission of this testimony did not take a significant period of time and presented no danger of confusing the issues or misleading the jury. As for undue prejudice, this testimony did cast defendant in an unfavorable light. However, again, it was far less inflammatory than the evidence presented to the jury as to how defendant killed the victim. And in light of defendant's self-defense claim, the probative

93

value of this evidence was substantial and not substantially outweighed by the danger of undue prejudice.

Therefore, we conclude the trial court properly admitted this evidence.

### 3. Plan to Stage Automobile Accident to Collect Money from Employer

The victim told J.W. and her father that defendant was considering staging an accident in which he would dive out of his Mustang at the last minute and his car would be destroyed. Defendant intended to thereafter sue his employer, claiming that the lawsuit would be worth $23 million because he was working excessive hours.

We agree with defendant that the trial court abused its discretion in denying his in limine motion to exclude this hearsay testimony. This statement bore no relation to any threats or defendant's capacity for physical violence or the victim's awareness thereof. Nor was any other connection made between this statement and the victim's fear of defendant. At best, the evidence showed the victim was afraid that defendant would do something illegal, but this fear was not pertinent to whether the victim was the aggressor or defendant's self-defense claim. We conclude this evidence was not relevant (see Evid. Code, § 210), and the trial court should have granted defendant's request to preclude it as such. (Evid. Code, § 350.)

However, we further conclude that, the admission of this evidence was harmless. The questions the jury was to answer was whether self-defense and imperfect self-defense had been negated and intent to unlawfully kill and premeditation and deliberation had been established. In light of the evidence discussed in our harmless error review related to defendant's 1101(b) contention, it is not reasonably probable that, had the statement about the plan to stage an accident not been admitted, a result more favorable to defendant would have been achieved. (See *Watson, supra*, 46 Cal.2d at pp. 836-837; see also *Riccardi, supra*, 54 Cal.4th at p. 827 [applying the *Watson* test to the admission of statements made by the murder victim concerning her state of mind and her fear of defendant].) Here again, we note the court instructed the jury that it could only consider

94

this evidence for the limited purpose of determining the victim's state of mind and it could not be used for any other purpose.

### F. Unpreserved Contentions and Ineffective Assistance of Counsel

Anticipating we would conclude the belated contentions he raises on appeal have been forfeited, defendant asserts that he was deprived of the constitutionally effective assistance of counsel.

### 1. Ineffective Assistance of Counsel Analysis

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].) The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, at p. 105.)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)  The likelihood of a different result must be substantial, not just conceivable.  (*Richter*, at p. 112.)

## 2.  Admissible Statements Establishing Circumstantial Proof of the Victim's Fear

We conclude that the evidence of the victim's statements concerning the scuba diving incident; defendant chasing a contractor with a bat and throwing rocks; the victim warning J.W. "[i]f anything happens to me, I want you to look at" defendant; the rape resulting in an unwanted pregnancy; that defendant was emotionally abusive and the victim's statement that she did not bruise easily in response to a question as to whether defendant physically abused her; and her fear of defendant because he was hiding money was all admissible as circumstantial evidence of the victim's fear of defendant.  (See *Riccardi, supra*, 54 Cal.4th at p. 823.)  This evidence was relevant to show that, because of this fear, the victim was not the initial aggressor and to negate defendant's self-defense story.

We further conclude the trial court would not have abused its discretion in admitting this evidence over a section 352 objection had such an objection been made.  This testimony did not present a probability that its admission would necessitate undue consumption of time, confuse the issues, or mislead the jury.  (See Evid. Code, § 352.)  Moreover, its probative value was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.  True, the evidence made defendant look bad, but it was not inflammatory, particularly when compared to the conduct underlying the charged offense.  Additionally, as noted, the trial court instructed the jury that evidence of the victim's statements was admissible for the limited purpose of assessing the victim's state of mind, and that it was not to be considered for any other purpose.

Therefore, we conclude that defendant's trial counsel's performance in which he failed to object to this evidence on the grounds now asserted did not fall below an

96

objective standard of reasonableness. (See generally *Strickland, supra*, 466 U.S. at pp. 688, 691-692; *Ledesma, supra*, 43 Cal.3d at pp. 216-217.) Moreover, in light of the evidence we summarized in our harmless error review concerning the section 1101(b) evidence, defendant has failed to establish prejudice.

### 3. Inadmissible Victim Statement - The Amsterdam Incident

Testimony concerning the Amsterdam episode, and whether defendant was malingering, as asserted by the People, was not a subject of defendant's in limine motion, although defendant essentially treats it as though it was and discusses it jointly with the alleged plan to stage an automobile accident, discussed *ante*. The Amsterdam incident was *discussed* at oral argument before the trial court on defendant's in limine motion, but as background information relevant to the alleged plan to stage an automobile accident. No specific objection was made with regard to this evidence. To the extent defendant contends that the Amsterdam evidence should have been precluded as irrelevant, the contention has been forfeited because of the failure to make a specific objection. (See Evid. Code, § 353; *Pearson, supra*, 56 Cal.4th at p. 438.) However, given defendant's ineffective assistance of counsel claim we next discuss this evidence.

We conclude this evidence was not relevant to the victim's fear of defendant as asserted by the People. It was thus not relevant, at least in the prosecution's case-in-chief. (See Evid. Code, § 210.) Accordingly, we further conclude that defendant's trial counsel could have made a valid objection to this testimony on relevance grounds. (Evid. Code, § 350.)

However, assuming there was no tactical reason for not objecting,[32] we also conclude defendant suffered no prejudice. Based on the evidence of defendant's guilt,

_____

[32] We note that since part of defendant's mens rea defense related to Dr. Lossy's testimony concerning the Amsterdam episode, defense counsel may very well have had a tactic reason for not objecting to this evidence.

discussed *ante* in our harmless error analysis concerning the section 1101(b) evidence and the relative insignificance of the Amsterdam incident evidence, defendant has not established a reasonable probability that he would have achieved a more favorable result had counsel objected to this evidence. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)[33]

### III.  Cumulative Error

Defendant asserts that the cumulative effect of the errors discussed in parts I and II of the Discussion warrants reversal. He asserts that, because the errors complained of involved *Chapman* error, the *Chapman* standard of review applies to the cumulative error analysis.

We disagree that reversal is required. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) However, any of the potential errors identified above "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no prejudice when considering defendant's claims separately. Viewed cumulatively, our conclusion is the same. Defendant was not deprived of a fair trial.

---

[33]  The conclusion that an error is not prejudicial under *Watson* yields the same result as to *Strickland* prejudice because the two standards are essentially the same. (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4.) Thus, even if oral argument before the trial court on defendant's in limine motion could be deemed to have preserved an objection concerning the admissibility of the Amsterdam incident, we would conclude that admission of that evidence was nevertheless harmless.

## IV. Sufficiency of the Evidence of Premeditation and Deliberation

### A. Defendant's Contentions

Defendant asserts that "as a matter of law," the evidence was legally insufficient to support the finding of premeditation and deliberation necessary for conviction of first degree murder. (§ 189.) Defendant asserts there is no evidence in this record of any of planning, motive, and the manner of the killing sufficient to support a finding of premeditation and deliberation. He specifically asserts that there was no evidence of planning or that the scissors defendant used to kill the victim were anything other than a weapon of opportunity. He also asserts that, while evidence of a defendant's subsequent behavior may furnish a basis for the conclusion that planning was involved, here, he admitted his behavior and did not attempt to conceal the killing. Defendant further contends that there was no evidence of any particular motive. Finally, he asserts that the manner in which he killed his wife does not support a finding of deliberation and premeditation; he asserts that, however brutal the killing, it was neither particular nor exacting, but rather more consistent with a frenzied attack.

### B. Standard of Review and the *Anderson* Guidelines

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Steele, supra*, 27 Cal.4th at p. 1249.) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Substantial evidence includes circumstantial evidence and any reasonable inferences that can be drawn therefrom. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069-1070, disapproved on other grounds in *Rangel, supra*, 62 Cal.4th at p. 1216.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) " 'If the

circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Kaufman* (2017) 17 Cal.App.5th 370, 380-381.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, italics added; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In *Anderson, supra*, 70 Cal.2d at pages 26-27, our high court stated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."

As our high court has since cautioned, however, " ' "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the

100

substantive law of murder in any way." ' " (*Casares, supra,* 62 Cal.4th at p. 824, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) The *Anderson* guidelines " ' "are descriptive and neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight." ' " (*Morales, supra*, 10 Cal.5th at p. 89; *Casares*, at p. 824.)

## C. Analysis

We have already discussed the admissible evidence in the context of the *Anderson* guidelines in our harmless error analysis related to the section 1101(b) evidence. We need not repeat that here. However, we shall address defendant's argument concerning the manner of killing.

Relying on *Anderson* and subsequent cases, defendant asserts that a killing which is particularly brutal or involves multiple wounds is not, in itself, sufficient to support a finding of premeditation and deliberation because it is just as consistent with a sudden, random explosion of violence as with calculated murder. (See *Anderson, supra*, 70 Cal.2d at pp. 24-25 ["the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' "]; see also *People v. Moon* (2005) 37 Cal.4th 1, 31; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1238; *People v. Alcala* (1984) 36 Cal.3d 604, 626, abrogated by statute as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.)

However, the fact that defendant inflicted numerous and varied injuries during his attack cannot insulate him from a determination that his killing of the victim was willful, deliberate, and premeditated. This is particularly true given the exacting nature of the fatal wound to the neck and jugular vein inflicted while the victim begged for her life for defendant's express purpose of ending the victim's life. (See *Anderson, supra*, 70 Cal.2d at p. 27 ["directly plunging a lethal weapon into the chest evidences a deliberate intention

to kill . . . ."].)  By his own admission, it can be reasonably inferred this was a calculated effort to ensure death rather than a mere unconsidered explosion of violence.

Viewing the evidence in the light most favorable to the judgment (*Steele, supra*, 27 Cal.4th at p. 1249), we conclude that it was legally sufficient to establish, beyond a reasonable doubt, that defendant acted willfully and with premeditation and deliberation in killing the victim.  Thus, we conclude that the evidence was legally sufficient to support the jury's determination that defendant was guilty of murder in the first degree.

## V.  Error in the Abstract of Judgment

Defendant asserts that the abstract of judgment must be corrected because, while the trial court imposed an indeterminate term of 25 years to life on count one, on the abstract of judgment, boxes are checked indicating indeterminate terms of both 25 years to life (Box 6b) and life without the possibility of parole (Box 5) were imposed. Respondent agrees and so do we.

The trial court sentenced defendant to 25 years to life and a consecutive one-year term for personal use of a deadly or dangerous weapon, for an aggregate term of 26 years to life.

" 'Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts.' " (*People v. High* (2004) 119 Cal.App.4th 1192, 1200, quoting *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Accordingly, we direct the trial court to correct the abstract of judgment to reflect that, on count one, defendant is sentenced to an indeterminate term of 25 years to life, and is not also sentenced to a term of life without the possibility of parole.

## DISPOSITION

We direct the trial court to strike the sentence of life without the possibility of parole reflected in box five of the abstract of judgment, prepare a corrected abstract of

judgment and send a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


                                        /s/
                                        MURRAY, J.



We concur:



      /s/
HULL, Acting P. J.



      /s/
ROBIE, J.